## Elgin, Joliet & Eastern Railway Company v. Michael Lawlor.

### Gen. No. 4,738.

1. CONTRIBUTORY NEGLIGENCE—*when person seeking to cross railroad tracks not guilty of.* Held, from the evidence, that the plaintiff, who was injured while seeking to cross railroad tracks in a buggy, was not guilty of contributory negligence.

2. REMARKS OF COURT—*when cannot be complained of.* Remarks made by the trial court which were part of a discussion ensuing a suggestion made by the complaining counsel, cannot be successfully urged as ground for reversal.

3. REMARKS OF COURT—*exception essential to preserving propriety of, for review.* In order to test upon appeal the propriety of remarks made by the trial judge, an exception to such remarks should be preserved.

4. CONVERSATIONS—*when had, out of presence of party, incompetent.* Except for purposes of impeachment and when they form a part of the *res gestae*, conversations had out of the presence of the party sought to be affected, are incompetent.

Elgin, Joliet & Eastern Ry. Co. v. Lawlor.

5. IMPEACHMENT—*how should be made.* The proper course, when the impeaching witness is produced, is simply to ask him whether or not the witness to be impeached made the statement in regard to which he has been questioned, at the time and place mentioned. It is true that the question to the impeaching witness need not be in the exact words of the question asked of the witness sought to be impeached, but it should be identical as to time, place and substance, and should be so framed as to admit of a negative or an affirmative answer. In fairness to the witness to be impeached, and in order that the testimony may be of any value for impeachment purposes, and for the further reason of keeping from the jury irrelevant and incompetent matter, this course should be pursued. It is improper to ask the witness to relate the entire conversation or to put the question in such a general form as to be calculated to elicit more than the statement made by the first witness in contradiction of his testimony, unless the statement to be proved is made intelligible only by a narration of the entire conversation.

6. MOTION TO STRIKE—*when denial of, proper.* A motion to strike is properly denied if too broad and includes evidence proper to remain in the record.

7. INSTRUCTION—*when containing abstract proposition of law improper.* An instruction which contains an abstract proposition of law, which does not tend to enlighten the jury, is improper and should be refused.

8. INSTRUCTION—*when, upon preponderance of evidence not erroneous.* An instruction upon the subject of the preponderance of the evidence is not erroneous as excluding the element of number of witnesses where such instruction is in form as follows:

"The jury are instructed that the preponderance of evidence in the cause is not *necessarily* alone determined by the number of witnesses testifying to a particular fact or state of facts."

9. BELL RUNG OR WHISTLE BLOWN—*statute pertaining to, construed.* The statute requiring a bell to be rung or a whistle to be sounded eighty rods from a crossing, and to be kept sounding, etc., refers to a locomotive at the head of a train and not at the rear, and requires such signal to begin when the part of the train nearest the crossing is at least eighty rods distant therefrom.

Action in case for personal injuries. Appeal from the Circuit Court of Will county; the Hon. ALBERT O. MARSHALL, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed March 13, 1907.

J. L. O'DONNELL and T. F. DONOVAN, for appellant; KNAPP, HAYNIE & CAMPBELL, of counsel.

BARR, BARR & BARR, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

The Elgin, Joliet & Eastern Railway and Cass street, in the suburbs of the city of Joliet, cross each other. At that crossing a person driving east on the highway is going in a direction slightly north of east, and a train coming from the south on the railroad is going slightly west of north, and they there cross nearly at right angles. In the early evening of September 22, 1904, Michael Lawlor, appellee herein, and his friend, Frank Hurley, were driving east on the south side of Cass street and crossing the three tracks of the railroad at that point, and when upon the most easterly track they were struck by the north end of a string of freight cars being pushed north over said crossing by an engine on the south end of said string of cars, operated by a crew of the Michigan Central Railroad Company, who were taking said cars to the yards of the Elgin, Joliet & Eastern Railway some distance north of said crossing. The buggy was destroyed by the collision. Lawlor was thrown to the west of the track and Hurley and the horse to the east, and the horse ran some distance till stopped. Lawlor was injured, and brought this suit against the Elgin, Joliet & Eastern Railway Company to recover damages therefor. The declaration charged that said engine and cars were operated by the defendant, or by persons authorized by said defendant to run said train of cars over said tracks, and that they were operated so carelessly and negligently that through the negligent and improper handling and driving of said engine and cars one of them struck against the carriage of plaintiff with great force, and caused the injuries; and also that no bell was rung or whistle sounded at the distance of at least eighty rods from said crossing, and kept ringing or sounding until said crossing was reached by said engine and cars, and

that in consequence of this default plaintiff was injured. There was a plea of not guilty and a verdict and a judgment for plaintiff for $1,650, from which judgment defendant appeals.

The case chiefly concerns questions of fact and the rulings and expressions of the trial judge, and we have studied the case from the record itself in order to fully understand all that occurred at the trial. The proof shows that the railroad passes through this vicinity in a swale or low place, there being something of a depression in the highway as the railroad is approached. The photographs show that the railroad and the highway are upon a level at the crossing, and the proofs show that a little way south of the crossing the railroad is elevated two or three feet above the level of the ground there. The railroad crosses the Rock Island Railroad about eighty rods south of Cass street and approaches Cass street on a curve, as stated by the engineer driving this train, who seems to have been confused as to the direction of the curve, but he testified that he was on the west side of the engine backing north at or before the time of the collision; he was on the inside of the curve, so that it appears that if a line was drawn across Cass street at this crossing at right angles to Cass street, this engine at the time of the collision was west of such line and on a curve. The plat in evidence is drawn upon a large scale and shows the railroad a comparatively short distance south of Cass street, and does not include the curve testified to by the engineer. The train consisted of fifteen box cars, and at the length of such cars testified to by the engineer this train was from thirty-two to thirty-five rods long, besides the length of the engine. A man stood on the car next to the engine to transmit signals to the engineer, and two men stood on the north car, but without lights. Appellant insists that it was broad daylight, but not only did appellee and Hurley testify that it was dusk and that it was six o'clock or after,

but the engineer also testified for appellant that it was 6:15 P. M. and that it was about dusk. Another witness for appellant testified that it was not dark and not real light, and still another that it was twilight, so that the jury were warranted in finding that it was dusk. Though it was shortly after sunset, the amount of light depended also upon other conditions, such as whether it was cloudy and the number of trees, etc., in that vicinity. South of the highway and next west of the railroad was the Faust lot, west of that a narrow street called Faust street, and next west the residence of the witness Hammond. On the Faust lot, in the corner made by the railroad and the street, was a barber shop some thirty feet long and sixteen feet high; about thirty feet back of that was the Faust residence, and still further back his barn. A fence ran from the barber shop south along the right of way. There were trees at various places on and around the Faust lot and shrubbery along the fence. This shrubbery cannot, all of it, be readily detected upon the photographs in evidence which, though valuable aids to understanding the situation, need to be examined with reference to the fact that they were taken in February, whereas at the time of this injury all witnesses agree that all the trees, shrubs and vines were covered with leaves, except certain dead trees, one of which was removed after the accident and before these photographs were taken. The proof makes it clear that a person travelling east towards the railroad, on the highway, could at certain points see a train approaching from the south, and yet that such view was very much obstructed by the buildings, trees, shrubs, vines, and the leaves thereon. The obstructions to a view of this crossing, by persons approaching it on the highway from the west, were well known to appellant and to the crew conducting the train. They took such a train over it nearly every day. The statute, the infraction of which is here alleged, requires a bell and steam whistle to be

Elgin, Joliet & Eastern Ry. Co. v. Lawlor.

placed on each locomotive and to be rung or whistled at least eighty rods from the place where the railroad intersects a highway and to be kept ringing or whistling till the highway is reached. We think it is manifest that this refers to a locomotive at the head of a train, and means that the whistling, or ringing of a bell, shall begin when the locomotive at the head of the train is eighty rods from the crossing, and shall be continued till such whistle or bell at the head of the train reaches the crossing. Appellee's proof tended to show that no bell was rung or whistle sounded, but this proof was of a negative character. The engineer testified that he blew the whistle when near the crossing of the Rock Island Road, about eighty rods from Cass street, and the fireman testified that he began ringing the bell at the same time and rang it continuously till the accident. But when the whistle was so sounded and when the bell began to so ring, if it was rung, the north end of this string of cars, the head of the train as it was being pushed, was about thirty-five rods nearer Cass street. In other words, when the signals were given at the rear of the train, the head of the train was only about forty-five rods from the crossing. If the bell was ringing and if appellee had heard it as he came to the crossing, it would have been a sound more than thirty-five rods from this highway, and that would not have notified appellee that the head of the train was almost at the highway. If he heard the bell at that distance away and so near the place where the engine had crossed the Rock Island Road, appellee might well have understood from it that he had plenty of time to cross. The two men on the head car testified that they saw appellee coming when the head car was five to ten rods away, or more, from the crossing, and that they saw that appellee was driving very rapidly and that apparently he did not look either way or notice the approaching train. They did not call out to appellee nor signal the engineer to stop until

an instant before the collision, when it was too late to prevent it. The engineer did his best to stop the train on receiving the signal the instant before the collision, but the train ran at least two car lengths beyond the street before it stopped, which would be about three car lengths from the point of collision. The jury had a right to consider that fact in determining which testimony as to the speed of the train was more nearly correct. We have no doubt that this testimony as to the obstructions to the view of a train approaching the crossing, and of the blowing of the whistle and the ringing of the bell at the rear instead of the head of the train, and of the failure of the men on the head car to either call out and warn appellee or signal the engineer to stop when they saw him approaching, under circumstances indicating that he would be struck, authorized a finding that the men operating the train were guilty of negligence as charged. They were not servants of appellant, but they were there doing business with appellant by its consent, and appellant was responsible for their negligence, under familiar principles.

The serious question is whether appellee was in the exercise of due care as he approached and drove upon this crossing. By his own admission he had been in two saloons that day, and appellant claims that on his cross-examination he was unable to give any reasonable account of his whereabouts and business during the day, and that the jury should have found that he spent the day carousing. Appellant had proof that a block and a half away from this crossing appellee was giving his horse several blows with his whip; that he dropped his whip in the road and that his horse went to the crossing on a run, or nearly on a gallop, or at a very fast trot. Several witnesses testified that when appellee was picked up they noticed the smell of liquor upon him, and that from his inability to stand erect without help they concluded he was drunk. Proof was made of statements by Hurley

indicating that appellee was driving very rapidly against the will and warning of Hurley, and some witnesses testified to a statement made by appellee tending to show that he was unable to hold his horse. If the jury had found that appellee was not in the exercise of due care for his own safety as he approached and drove upon this crossing, that conclusion could not have been disturbed by this court.

But there was much evidence to the contrary. Appellee was a farmer operating a farm of 120 acres. On the evening of September 21st, he went to Mokena with his horse and buggy, to see whether, if he could sell the straw upon his farm, he could get a gang of pressers to come to his farm eight miles distant and press the straw. The amount of the straw and the magnitude of the financial operation involved in its sale is only indicated by the fact that he felt warranted in hiring a gang of pressers to come to his place to press it. He stayed at Mokena over night with Hurley. The morning of the 22nd he drove to Joliet, a distance of ten or twelve miles, coming into town over another road than Cass street. He went there for the purpose of finding a purchaser for his straw. He and Hurley went to a saloon where they met a relative of appellee, at whose invitation appellee had a drink of whiskey. He testified, without any direct contradiction, that he had no other drink of intoxicants that day. They then went to the center of the city, and to another saloon then kept by an acquaintance whom appellee thought could tell him where he could sell his straw. Hurley testified that appellee might have taken a glass of beer there. Appellee testified that he drank pop and not beer. He testified he was in no other saloon that day. Appellee and Hurley then separated, and appellee drove his horse to a feed yard and fed him, and then went to a restaurant which he named and had dinner. He then returned to the feed yard, got his horse and buggy, drove upon the street, hitched his horse and

went to White's cigar store. He there met a Mr. Chamberlin and a Mr. Stevens. He was in and out of that store several times that afternoon, and had several conversations with Chamberlin and with Stevens, and as a result made a contract for the sale of his straw. Chamberlin told appellee he knew a man who had a horse he wanted to trade. Appellee drove with Chamberlin to the store kept by the owner of the horse and from there to the barn where the horse was. The horse was hitched up, and appellee and its owner took a drive with it, and then they took another drive with appellee's horse. No trade was finally consummated. Appellee returned to White's store, and at about 5:45 or 6 P. M. he and Hurley started on the return trip to Mokena, going east on Cass street. As they drove towards this crossing they were in the street car track. A street car from the west came up behind them and rang a gong or bell as a warning to appellee to get off the track. Appellee and Hurley testified that appellee turned his horse off from the street car track, and gave the horse a single cut with the whip to hurry him off the track. At this time they were about a block and a half from the crossing. Appellee's horse was a farm horse, not city bred, and was somewhat frightened by the street car as it passed him, but both appellee and Hurley testified that appellee immediately quieted him down and did not use the whip upon him, except the single stroke as they were turning out of the street car track, and that before they reached the crossing he had been reduced to a slow trot. The street car, which passed him about a block and a half west of the crossing, reached the crossing and stopped, and the conductor went ahead of the car and upon the railroad tracks, and then the street car started and passed over the railroad tracks. This all occurred before appellee reached the railroad. This had a strong tendency to show that appellee's horse was not running or travelling at great speed; and the fact that the conductor

caused his car to pass over the tracks just ahead of appellee tended to make appellee believe it was safe. Appellee testified that he looked both north and south to see if there were any approaching trains or engines; that he saw nothing at the south, and heard no bell or whistle in that direction; but that north of this crossing, towards the yards of the railroad company, there were always engines moving, and that he heard a bell or saw an engine in that direction, and was chiefly engaged in watching to see that no engine was approaching Cass street from that direction. Appellee and Hurley denied making the statements testified to by appellant's witnesses. Appellee was removed to a hospital, and was immediately attended and worked over by a physician, and the latter testified that he observed no traces or smell of liquor upon appellee. As it was proved that appellee was seriously injured about one knee, and in his legs and ankles, and in his back, so that he remained in the hospital under treatment a month, and was obliged to wear a plaster cast upon his right knee for several months, and was totally disabled for labor for a long time, the jury might well have concluded that his inability to stand erect without assistance when picked up after the accident was the result of the injuries he received and was not proof that he was intoxicated. We think appellee fairly accounted for his whereabouts and engagements while in Joliet, and that if the jury believed him and Hurley they could reasonably find that he was not guilty of negligence as he approached and went upon this crossing. In our judgment we would not be warranted in disturbing the conclusion reached by the jury that he was in the exercise of due care. The reasons why the verdict of a jury upon such conflicting testimony ought not to be disturbed upon the facts are fully and forcibly stated in Calvert v. Carpenter, 96 Ill. 63, 67.

Appellant complains of the language and rulings of the court while its witness Hammond was on the

stand. Appellant asked for a conversation the witness had with Hurley out of the hearing of appellee just after the accident. Objection was made, and the court said he did not think they could go into that, and then suggested the question whether it was a part of the *res gestae.* Appellant argues as if that was the beginning and end of the matter, whereas by reading the record itself from pages 197 to 203, inclusive, it will be found that upon objection made to the question the court said the conversation was not in the presence of appellee, and counsel for appellant then argued that it would not have to be in the presence of appellee if it was part of the *res gestae,* so that appellant based its right to the question on the ground that this was a part of the *res gestae,* and that remark by the court was suggested by the argument of appellant's counsel. Moreover, while the court hesitated at first, yet a moment later the entire conversation was admitted in answer to appellant's questions, and appellant has nothing of which to complain.

But in fact the court's hesitation was warranted. The question called for all that Hurley said in a conversation when appellee was not present. Hurley was not a party, and appellee was not bound by what Hurley said out of appellee's presence. It was only competent so far as it tended to impeach Hurley. Appellant had asked Hurley two questions only on this subject, namely, whether in his conversation with Hammond at the time and place fixed he had said "We saw the train coming up the track and heard the whistle, but could not stop the horse in time;" and "he (meaning appellee) whipped the horse before he got to the track, and that is why he could not stop him in time." Hurley said he did not so state to Hammond. Appellant had a right to ask Hammond whether at that time and place Hurley did make these two statements to him, and these questions must have been answered by "yes" or "no." Appellant had no right to its questions calling for all that Hurley said.

If the proper questions had been asked and Hammond had answered that Hurley did so state, it would have been at the option of appellee on cross-examination to call for the entire conversation or not, as he saw fit. Appellant was not entitled to it. No other course will keep out incompetent and immaterial matter, to the peril of which the opposite party ought not to be subjected. This rule is fully stated, and authorities supporting it are cited in 30 Am. & Eng. Ency. of Law., 2nd ed., 1117, as follows: "The proper course, when the impeaching witness is produced, is simply to ask him whether or not the witness to be impeached made the statement in regard to which he has been questioned, at the time and place mentioned. It is true that the question to the impeaching witness need not be in the exact words of the question asked of the witness sought to be impeached, but it should be identical as to time, place and substance, and should be so framed as to admit of a negative or an affirmative answer. In fairness to the witness to be impeached, and in order that the testimony may be of any value for impeachment purposes, and for the further reason of keeping from the jury irrelevant and incompetent matter, this course should be pursued. It is improper to ask the witness to relate the entire conversation or to put the question in such a general form as to be calculated to elicit more than the statement made by the first witness in contradiction of his testimony, unless the statement to be proved is made intelligible only by a narration of the entire conversation." (Abbott's Civil Trial Brief, 2nd ed., 192. This is recognized as the correct practice in C. W. & D. Ry. Co. v. Ingraham, 131 Ill. 659, 668, and in Gormley v. Hartray, 105 Ill. App. 625. We so held the rule in Manchester Fire Assurance Co. v. Ins. Co. of Ill., 91 Ill. App. 609. The trouble was therefore brought on by appellant's persistence in pressing an improper question, and we do not think it should be heard to complain. Appellant also complains because, when its

counsel a little later again asked the witness to give the conversation between himself and Hurley, the court said "He has." This was but equivalent to suggesting that the question had already been fully answered, which was the fact. Appellant then asserted that the witness had been interrupted in the midst of the narration of the conversation. If this was so, the record as written does not disclose it. Appellant then put a question which suggested to the witness another statement by Hurley. Appellee objected. Appellant complains because the court then asked the witness: "What do you say about that? Do you remember any such thing as that?" to which the witness replied: "Something in that strain." On motion of appellee the court excluded that answer. Appellant then put the question in a fuller and more complete form, the court overruled an objection by appellee, and appellant had a full and adequate answer. In all this we see nothing harmful to appellant, and save to the suggestion by the court whether this was a part of the *res gestae,* the exceptions were not taken by appellant but by appellee. During the questions and objections above narrated, the court inquired whether at the time of the conversation between the witness and Hurley appellee had been taken away, and the witness replied that he had not been picked up yet. A little later the witness testified that after his conversation with Hurley he asked a Mr. Baker, who had come to the scene of the accident, whether they had better pick up appellee and see whether he could stand or not. The court again asked if appellee had not been picked up at that time, and the witness said he had not. After a little further testimony from Hammond the following colloquy took place between the court, the witness and counsel for appellant:

"The Court: Are you quite certain that he was not picked up until after you and he had gone up there and seen the horse and come back, and the train had gone on?

"The Witness: I ain't certain.

"The Court: Ain't you confused about that?

"The Witness: I ain't certain. I know I was there and they picked him up.

"The Court: Reflect upon that. It don't seem credible.

"Mr. Donovan: Well, your honor, that would not make a bit of difference.

"The Court: I understand.

"Mr. Donovan: I don't want the jury to get the impression that it does.

"The Court: He says he ain't so sure about that point.

"The Witness: It is something that I could not remember.

"The Court: On reflection, you would not say?

"The Witness: I would not say. They might have picked him up before."

It is urged that these remarks of the court were highly prejudicial to appellant. Hammond was standing in his north barn door, at the rear of his residence, just west of Faust avenue, at the time of the accident, and saw it. He instantly went to the place of the collision. Appellee had been thrown to the west and lay between the tracks. Hurley and the horse had been thrown to the east of the tracks. Hurley had not been much hurt and had got up. The horse had run till stopped at a grocery store east of the tracks. The train had stopped with the box cars covering the crossing. As Hammond was west of the crossing he necessarily came first to the immediate vicinity where appellee lay. His testimony so far had seemed to imply that he passed by appellee lying on the ground, got through between the cars to the east side, walked with Hurley to where the horse was and had this talk with him about how the accident happened, and then returned and went to the west side of the crossing and helped to pick up appellee. It is evident that the court naturally thought that the witness was confused and did not mean to be understood that he passed right by the injured man lying

on the ground without rendering any assistance, and did so much before he came back to help him; and the court was really trying to get the witness to reflect upon what he had said, to see if on reflection it would not turn out that the order of events was just the reverse. After an adjournment appellant recalled Hammond and asked him about appellee's condition, and on cross-examination he described his acts in helping appellee to walk after he was picked up, and said that this was before he walked up after the horse, and that he was mistaken in his former statement that he went after the horse before appellee was picked up. The court therefore was correct in its suggestion to the witness that he had got the order of events confused. Of course it is not proper for the court to say, either to a witness or in the hearing of the jury, that his evidence does not seem credible; and if the effect is to discredit the witness before the jury, or to frighten the witness, such a remark by the court would be serious error. But we do not think that the jury would consider the language of the court as intended to discredit the witness, but rather as in the interest of the appellant who called him, to induce the witness to voluntarily correct an obvious error. While it would have been better if the court had used some other expression than "It don't seem credible," yet we think what was said in Chi. City Ry. Co. v. McLaughlin, 146 Ill. 353, 359, where the trial judge said of the answer of a witness to a question, "I don't think he answered it fairly," is applicable here: "It would have been better to have used some other word than 'fairly.' But after examining all the testimony of the witness, including the running fire of controversy and dialogue between opposing counsel and the court, we do not think there was any intention to reflect upon the credibility of the witness, or that the jury could have so understood what was said." But, still further, appellant took no exception to the remark by the court. Before the conclusion of Hammond's testimony when

recalled there was a controversy between counsel for the respective parties, as to which appellant in his brief asserts that the court summarily dismissed the witness, and refused to let appellant's counsel make an offer in the record. A reading of this controversy on pages 224, 225 and 226 of the record does not sustain these assertions. This was not during an examination by appellant, but during a cross-examination by appellee. The court did twice tell the witness that he could leave the stand unless another question was put, but the witness did not leave the stand, and after this controversy was over, appellant put another question to the witness, the court overruled an objection thereto, and the question was answered, and appellant did not seek to question the witness further. The court did not deprive appellant's counsel of any question which he wished to put to the witness, but cut short his effort to question the court. When appellant's counsel wanted to make a statement in the record the court said he did not want him to make statements before the jury, but directed the reporter to go with counsel into an adjoining room and take down the statement. If appellant had wished to make an offer of proof, it could only make it in the presence of the trial judge, and if the court thought it ought not to be made in the presence of the jury, the jury should have been withdrawn. But appellant was not then offering proof. Appellee was cross-examining, and the controversy arose upon an objection by appellant to a question put by appellee, and though the court did not directly say that the objection was sustained or overruled, he did tell the witness to leave the stand unless another question was put, which meant that the objection to that question was sustained, and the question was not answered, and appellant had the full benefit of its objection. The offer which appellant's counsel was not permitted to make was not to prove some fact, but apparently he wished to make a statement of his understanding of the posi-

tion of the controversy between himself and appellee's counsel. The bill of exceptions shows all that had occurred, and appellant was deprived of nothing, and its objection was already practically sustained. No answer was made to the question to which appellant objected. This controversy is much better understood by reading the record than by reading the abstract.

Appellant claims that the court refused to exclude opinions given by the attending physician, Dr. Brannon, based on the history of the case obtained from appellee, and upon his knowledge of the prevalence of tuberculosis among appellee's brothers and sisters, and that this was error. A reading of Dr. Brannon's testimony in the record dispels this claim. These opinions were given on direct examination, and there was nothing then to indicate that they had any other basis than what the doctor discovered on examining and treating his patient. Cross-examination showed that the opinion of the physician that these injuries were liable to lead to tuberculosis was based in part upon his knowledge of the history of the family. Counsel for appellant then moved that all the testimony of Dr. Brannon on the question of appellee's injuries, and that they are permanent, and that he will have tuberculosis, be excluded. This motion was obviously too broad as it called for the exclusion of the testimony of the doctor as to the physical condition in which he found the patient when he reached the hospital that night, and as to his subsequent treatment and the patient's subsequent condition as he saw it. The court properly denied the motion. Counsel for appellant then moved to exclude all the testimony of the witness concerning the symptoms of tuberculosis. This was granted. No further motion was made, and appellant had nothing of which to complain on that subject.

It is argued that the court erred in giving the second, third, fourth and sixth instructions requested by

appellee. The second was as follows: "You are instructed that railway trains approaching a public crossing in a thickly settled district are required to use a higher degree of care than they are required to observe in approaching public highways in a sparsely settled district." This was an attempt to state the legal proposition laid down in Overtoom v. C. & E. I. R. R. Co., 181 Ill. 323, and cases there cited, and in Boyd v. C., B. & Q. R. R. Co., 103 Ill. App. 199, and Wabash R. R. Co. v. Barrett, 117 Ill. App. 315. It should have been refused. It was an abstract proposition of law. The jury had nothing to do with a comparison between the duty of appellant at this crossing and its duty at a crossing in a sparsely settled district. But we fail to see how it could harm appellant. It did not state the duty of appellant at either place. It really gave the jury no information. The third instruction for plaintiff began: "The jury are instructed that the preponderance of evidence in a case is not necessarily alone determined by the number of witnesses testifying to a particular fact or state of facts." The instruction then detailed various matters which the jury should consider in determining on which side the preponderance is, and did not suggest the number of witnesses as one of the matters to be considered; and it concluded thus: "And from all the evidence, facts and circumstances in evidence, determine on which side is the weight or preponderance of the evidence." It is argued that this excluded the number of witnesses as an element to be considered, and that it was therefore erroneous, under Hays v. Johnson, 92 Ill. App. 80. The instruction there considered told the jury positively that the preponderance of evidence did not alone consist in the number of witnesses, and we said that was not always true. The instruction before us now says that the preponderance is not *necessarily* alone determined by the number of witnesses. The word "necessarily" distinguishes the present instruction from the one then

considered. The second instruction in W. Chi. St. R. R. Co. v. Lieserowitz, 99 Ill. App. 591, was in substance like the one here involved, and like this, in its enumeration of details it did not mention the number of witnesses. It was held that it impliedly conceded that the element of number was a proper matter for consideration. That judgment was affirmed in 197 Ill. 607, in reliance upon C. & A. R. R. Co. v. Fisher, 141 Ill. 614, 626, where an instruction said "that the preponderance of evidence may not depend entirely upon the number of witnesses testifying on either side of the case." It was held that "may" and "entirely" were qualifying words, and that the instruction impliedly conceded that where all other things were equal, the greater number must control. So, in this case, when the instruction said that the preponderance "is not *necessarily* alone determined by the number of witnesses testifying to a particular fact," it implied that the number was one of the elements to be considered, and that the preponderance *might* depend upon that element. N. Chi. St. R. R. Co. v. Anderson, 176 Ill. 635. We think the fourth instruction was correct, and that the sixth, in the language of the statute, was justified, not only by the proof we have already mentioned, that the bell and whistle were at the rear of the train about thirty-five rods from its head, but also because there was testimony tending to show that no bell was rung.

While this case is close upon the facts, and the jury would have been sustained in finding that plaintiff was not exercising due care, yet we are of opinion that there is no reversible error in the record committed against appellant, and that there is much testimony tending to sustain plaintiff's allegation that he was in the exercise of due care, and that the verdict of the jury, approved by the trial judge, ought not to be disturbed by us upon the facts.

The judgment is therefore affirmed.

*Affirmed.*