# Illinois Official Reports

## Appellate Court

---

### *People v. Lewis*, 2017 IL App (4th) 150124

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRAVIS E. LEWIS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0124 |
| Filed<br>Rehearing denied | April 19, 2017<br>June 2, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 14-CF-1446; the Hon. Harry E. Clem, Judge, presiding. |
| Judgment | Affirmed; cause remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier and Warner S. Brockett, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Aimee Sipes Johnson, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Appleton and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1        In January 2015, a jury found defendant, Travis E. Lewis, guilty of aggravated battery. The trial court later sentenced him to five years in prison.

¶ 2        Defendant appeals, arguing that he was denied a fair trial because (1) the trial court erroneously allowed the jury to consider an improperly admitted prior inconsistent statement as substantive evidence in violation of section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)) and (2) the State impermissibly vouched for a witness's credibility during its closing argument. Defendant also argues that he was entitled to a $100 presentence credit against his eligible fines.

¶ 3        For the reasons that follow, we affirm defendant's conviction and five-year sentence. Because we accept the parties' agreement that defendant is entitled to the application of a $100 presentence credit to satisfy the fines the trial court imposed, we remand with directions.

¶ 4                                    I. BACKGROUND

¶ 5        In October 2014, the State charged defendant with aggravated battery, alleging that he strangled Valisa Byndum (720 ILCS 5/12-3.05(a)(5) (West 2014)).

¶ 6                                A. The Trial Evidence

¶ 7        At defendant's January 2015 jury trial, the following evidence was presented.

¶ 8                                1. *The State's Evidence*

¶ 9        Byndum testified that she knew defendant through his sister, Rachel Simmons, whom Byndum considered her best friend. At some point, defendant acquired Byndum's cellular phone number and sent her text messages of a suggestive and explicit nature that made Byndum uncomfortable. Byndum initially ignored defendant's texts, but when he persisted, Byndum told defendant that she was not interested in a relationship. Eventually, Byndum told defendant that if he did not stop texting her, she would tell defendant's girlfriend about his messages.

¶ 10        On October 17, 2014, Byndum drove Rachel to the apartment of Hailey Simmons, Rachel's cousin. Upon entering, Byndum noticed defendant, who immediately walked up to Byndum, grabbed the phone she was holding, and walked toward the bathroom. Rachel intervened, took the phone from defendant, and returned it to Byndum. Defendant then approached Byndum as she stood in the kitchen of Hailey's apartment and reached for her neck. Byndum stepped back toward a wall, and Rachel placed herself between Byndum and defendant. Defendant reached around Rachel with one hand and choked Byndum, which caused her pain and knocked her eyeglasses off her face. Byndum estimated that defendant obstructed her breathing for a couple of seconds. Thereafter, Byndum drove away from the apartment and later called the police to report the incident.

¶ 11        Champaign police officer Justin Prosser testified that on October 17, 2014, he responded to a dispatch regarding a battery. Upon his arrival at a location later determined to be the home of Byndum's mother, Prosser questioned Byndum privately and then questioned Rachel in Byndum's presence. Prosser prepared a written report regarding their respective accounts. Prosser did not see any injuries or bruising on Byndum, which he opined was not unusual.

¶ 12                2. *Defendant's Evidence*

¶ 13      Defendant testified that he had known Byndum for about six years. On October 17, 2014, defendant was at Hailey's home with approximately six other people. Rachel and Byndum later entered the home. Defendant approached Byndum and asked to see her phone. When Byndum "pulled her phone out," defendant took it and went into the bathroom. Defendant intended to delete certain text messages from Byndum's phone, characterizing them as "inappropriate" messages that they had mutually exchanged. Defendant explained that a week earlier, Byndum threatened to show the inappropriate exchanges to his girlfriend.

¶ 14      Byndum and Rachel followed defendant into the bathroom, where Byndum began hitting and pushing him. Defendant understood that Byndum was acting out because he had possession of her phone. Defendant gave the phone to Rachel, and Rachel returned it to Byndum. As defendant exited the bathroom, Byndum continued attacking defendant. Defendant went into the kitchen, and Rachel placed herself between defendant and Byndum. Rachel asked Byndum to stop hitting defendant. Defendant admitted that while Rachel was between them, he grabbed Byndum's arm with one hand and pushed her with the other. Defendant denied that he made contact with Byndum's neck. Defendant did not hear Byndum gasp for air or complain that she was being choked.

¶ 15      During defendant's direct examination, the following exchange occurred:

        "[DEFENSE COUNSEL]: After Rachel was standing between you, what happened?

        [DEFENDANT]: After the incident within itself, what happened between the choking and stuff? Byndum left. Rachel left."

¶ 16      During the State's cross-examination, defendant acknowledged that he responded to defense counsel's question by referring to "the choking and stuff" but denied that any choking occurred.

¶ 17      Hailey testified that on October 17, 2014, several of her cousins visited her apartment, and she noticed a commotion in her kitchen between Byndum, Rachel, and defendant. Hailey observed Rachel between Byndum and defendant "playing the peacemaker" by attempting "to restrain Byndum from hitting [defendant]." During their altercation, Hailey did not see defendant grab Byndum by her neck.

¶ 18      Rachel testified that on October 17, 2014, she and Byndum went to Hailey's apartment, where they encountered defendant. Shortly after their arrival, Rachel observed defendant take Byndum's phone and walk into the bathroom. Rachel followed Byndum into the bathroom, where Rachel took the phone away from defendant and returned it to Byndum. After leaving the bathroom, defendant and Byndum got into an argument in the kitchen of Hailey's home. Rachel stood between them, facing defendant. Rachel testified that Byndum and defendant were "swatting" at each other. Because of the space Rachel occupied between defendant and Byndum, Rachel prevented them from making contact with each other. Rachel did not see defendant place his hands on Byndum's neck or hear Byndum gasp for air. At one point, Rachel saw defendant push Byndum back. Rachel estimated that the incident ended quickly.

¶ 19      Later that night, Rachel went to the home of Byndum's mother, where Byndum was present. Rachel testified that she spoke to Officer Prosser there regarding the earlier incident between Byndum and defendant.

¶ 20      During the State's cross-examination of Rachel, the following exchange occurred:

- 3 -

"[THE STATE]: So you did decide to talk to *** Prosser; is that correct?

[RACHEL]: Correct.

* * *

[THE STATE]: Do you remember what you told [Prosser]?

[RACHEL]: Oh, yes, I remember some of the stuff that I told him.

[THE STATE]: Do you remember telling him that your cousin, the defendant, choked your friend, Rachel—or excuse me, you're Rachel—your friend, Byndum, twice?

[RACHEL]: No."

¶ 21                          3. *The State's Rebuttal Evidence*

¶ 22    Prosser testified in rebuttal that Rachel provided him an account of the incident that occurred between defendant and Byndum. He testified, without objection, as follows:

"I first asked Rachel if she would tell me what happened. She seemed kind of reluctant to tell me what happened. Byndum asked her just to tell me what happened, and Rachel then proceeded to tell me that her [*sic*] and Byndum went to a friend's' apartment. *** When they arrived, [defendant] took the phone from Byndum's hand and went toward the back of the apartment. Her [*sic*] and Byndum followed [defendant]. Rachel was able to get the phone away from [defendant], give it back to Byndum, and then her [*sic*] and Byndum went to the kitchen area of the apartment. [Defendant] began to yell at Byndum. [Defendant] then got in Byndum's face and began yelling at her and calling her names. Rachel was able to position herself between [defendant] and Byndum with Rachel's *** facing defendant ***. [Defendant] continued to yell at Byndum and call her names. At that point, *[defendant] reached past [Rachel] and grabbed [Byndum] twice around the neck*. Rachel then pushed [defendant] off of Byndum, and Byndum and Rachel left the apartment." (Emphasis added.)

¶ 23                  B. The Jury's Verdict and the Trial Court's Sentence

¶ 24    The jury found defendant guilty of aggravated battery, and the trial court sentenced him to five years in prison.

¶ 25    This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27              A. Defendant's Erroneous Claim That the Trial Court Improperly Admitted a
                 Witness's Prior Inconsistent Statement Under Section 115-10.1 of the Code

¶ 28    Defendant erroneously argues that the trial court erred when it allowed the State to introduce Rachel's prior inconsistent statement as substantive evidence, allegedly in violation of the foundational requirements of section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2014)). This argument is erroneous because section 115-10.1 of the Code has nothing to do with this case. That section typically applies when a party, usually the State, seeks to introduce the prior inconsistent statement of a witness *whom it has called to testify*. Because Rachel testified as a defense witness, the State was permitted to impeach her by showing that she had made an oral prior statement inconsistent with her trial testimony. The State sought by this

impeachment to undercut her credibility in the eyes of the jury. Further, we note that neither the trial court nor the attorneys ever described Rachel's prior inconsistent statements as admissible as substantive evidence under section 115-10.1 of the Code. In fact, neither the court nor the attorneys ever referred to that section during the trial.

¶ 29     1. *Section 115-10.1 Typically Applies to "Turncoat Witnesses"*

¶ 30     This court recently explained in *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 65, 39 N.E.3d 1101, that "[t]he purpose of section 115-10.1 of the Code is to protect parties from turncoat witnesses who, while on the stand at trial, disown a prior statement by testifying differently or professing inability to remember the subject matter." (Internal quotation marks omitted.) See also *People v. Cruz*, 162 Ill. 2d 314, 362, 643 N.E.2d 636, 659 (1994) ("Now that a party can admit into evidence a 'turncoat' witness's prior inconsistent statement by complying with section 115-10.1, the introduction of oral inconsistent statements under the guise of impeachment should be foreclosed."). For other cases discussing how the statute was designed to protect the parties from turncoat witnesses, see *People v. White*, 2011 IL App (1st) 092852, ¶ 52, 963 N.E.2d 994; *People v. Thomas*, 354 Ill. App. 3d 868, 882, 821 N.E.2d 628, 640 (1st Dist. 2004); *People v. Carlos*, 275 Ill. App. 3d 80, 83, 655 N.E.2d 1182, 1183 (4th Dist. 1995); *People v. Fauber*, 266 Ill. App. 3d 381, 391, 640 N.E.2d 689, 695 (4th Dist. 1994).

¶ 31     Experience demonstrates that section 115-10.1 of the Code is, in fact, used almost always with regard to "turncoat witnesses," which, as noted above, was the primary reason for the enactment of the statute. Nonetheless, we acknowledge that (1) section 115-10.1 makes no reference to "turncoat witnesses" and (2) the language of that statute is broad enough to include prior inconsistent statements made by witnesses whom the party (seeking to admit those prior inconsistent statements as substantive evidence) did not call to testify. To clarify this point, if the State had impeached Rachel by presenting evidence of her prior inconsistent statement to Prosser that met the foundational threshold for admissibility under section 115-10.1(c)—such as, perhaps, if she had written or signed the statement she made to Prosser or Prosser had recorded it by electronic means—then, upon the State's completing its impeachment of Rachel with such a prior inconsistent statement, that prior inconsistent statement would be admissible substantively under section 115-10.1 for the jury's consideration.

¶ 32     However, none of those circumstances was present in this case. Here, Rachel testified as a defense witness, and the State sought to impeach her by first confronting her on cross-examination with a prior oral statement she made to Prosser that was inconsistent with her trial testimony and then completing the impeachment by calling Prosser (the impeaching witness) to testify that Rachel had made that statement. (We call Prosser "the impeaching witness" because that is a term of art used to describe the witness who is called to complete impeachment once a proper foundation has been laid.) What happened in this case was standard, run-of-the-mill impeachment of an opposing party's witness by the introduction of that witness's prior inconsistent statement, and section 115-10.1 does not address or affect such routine impeachment.

¶ 33     2. *Prior Inconsistent Statements Used To Impeach a Witness*
*Do Not Constitute Substantive Evidence*

¶ 34     Almost 100 years ago, the Illinois Supreme Court in *People v. Popovich*, 295 Ill. 491, 495, 129 N.E. 161, 163 (1920), wrote the following: "It is always competent to show, as a matter of

impeachment, that a witness made a statement outside of court concerning material matters inconsistent with his testimony on the witness stand." That is essentially all the State did in the present case—confront Rachel, when she testified as a witness for defendant, with her prior statement the State contended was inconsistent with her trial testimony.

¶ 35 When a witness is impeached with statements made by him out of court, those statements may not be considered for their truth—that is, they do not constitute substantive evidence. The fact that the witness made different, contradictory statements should be used *only* to undermine the credibility of the witness. *People v. Virgin*, 302 Ill. App. 3d 438, 448, 707 N.E.2d 97, 104 (1998). See also *People v. Thomas*, 354 Ill. App. 3d 868, 884, 821 N.E.2d 628, 642 (2004) (generally, a prior inconsistent statement is admissible solely for impeachment purposes, not as substantive evidence of the truth of the matter asserted); *People v. Eggert*, 324 Ill. App. 3d 79, 81, 754 N.E.2d 474, 477 (2001) (when evidence of a witness's prior inconsistent statement is admissible to impeach his credibility, such evidence is admitted not as proof of the truth of the facts stated out of court, but as doubt cast on the testimony by showing the witness's inconsistency).

¶ 36 These holdings are consistent with the definition of substantive evidence, which is evidence that is "adduced for the purpose of proving a fact in issue, as opposed to evidence given for the purpose of discrediting the witness *** or of corroborating his testimony." (Internal quotation marks omitted.) *People v. Suastegui*, 374 Ill. App. 3d 635, 642, 871 N.E.2d 145, 150 (2007). See also *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1282 (D.C. Cir. 2015) (substantive evidence is evidence "which is offered to establish the truth of a matter to be determined by the trier of fact" (internal quotation marks omitted)).

¶ 37 3. *Proper Procedure To Complete Impeachment*

¶ 38 Earlier in this opinion, we quoted the State's cross-examination of Rachel, where she was asked about her conversation with Prosser. In that cross-examination, the State asked Rachel the following question: "Do you remember telling [Prosser] that your cousin, the defendant, choked your friend, Rachel—or excuse me, you're Rachel—your friend, Byndum, twice?" Rachel responded, "No." (Actually, the better phrasing of the question to Rachel to lay the foundation for a later impeachment would have been for the State to have asked its question as follows: "You told Prosser the defendant choked your friend twice, didn't you?" or "Isn't it true that you told Prosser defendant choked your friend twice?" Asking Rachel whether she *remembered* telling Prosser that defendant choked her friend is not quite the same thing.)

¶ 39 Having elicited this testimony from Rachel, the State was then duty bound to complete the impeachment by presenting extrinsic evidence that Rachel in fact had made the statement to Prosser she had just denied. In *People v. Williams*, 204 Ill. 2d 191, 211-12, 788 N.E.2d 1126, 1139 (2003), the supreme court explained the reason for this rule, as follows:

"Generally, the State may not impeach a defense witness on cross-examination with a prior inconsistent statement unless the State can prove that statement with extrinsic evidence if the witness denies making it. [Citations.] The inherent danger posed by such cross-examination questions is that the jury will ignore the witness' denial, make a presumption that the insinuation created by the questions is accurate, and substitute the presumption for proof. [Citations.] The State must have a good-faith basis to ask the cross-examination questions, as well as the intent and the ability to complete its impeachment."

¶ 40        In the present case, the State purported to complete the impeachment of Rachel by calling Prosser (the impeaching witness), but as is often the case, the State did not follow correct procedure in doing so.

¶ 41        It should be remembered that the *only* matter at issue when the State called Prosser was to complete its impeachment of Rachel by establishing through Prosser's testimony that he had a conversation with Rachel in which Rachel told him that the defendant choked her friend, Byndum, twice. Instead of directly asking that question of Prosser, the State asked him if he recalled what was said in his interview with Rachel. When Prosser responded, "Yes," the State then asked, "Could you please begin at the beginning?" In response, Prossser described in some detail (which we earlier quoted in this opinion) what Rachel told him about the incident. The important—and the only *probative* portion—of Prosser's rebuttal testimony was when he testified that Rachel told him that defendant "reached past [Byndum] and *grabbed* her twice around the neck." (Emphasis added.)

¶ 42        No objection was made to Prosser's testimony, despite there being multiple problems with it. First, Prosser's account about what Rachel told him is *not* inconsistent, in a technical sense, with Rachel's testimony regarding her conversation with Prosser. That is, when the State attempted to lay the foundation for Rachel's impeachment by a prior inconsistent statement, the State asked Rachel on cross-examination if she remembered telling Prosser that defendant "choked" Byndum twice, and Rachel replied no. However, when Prosser testified in rebuttal as the impeaching witness and the State asked the open-ended question in rebuttal for him to describe his conversation with Rachel, he did not use the term "choked." Instead, he testified that Rachel told him that defendant "grabbed" Byndum twice around the neck.

¶ 43        This may at first seem like a minor matter, but it is not. Grabbing someone around the neck is not the same as choking that person, although if one grabbed a person strongly enough around the neck, choking might well result. Nonetheless, the fundamental rule of impeachment by a prior inconsistent statement is that the extrinsic evidence of the statement having been made—with which the declarant was confronted on the witness stand—*must be the same statement with which the witness was confronted*. Here, that did not happen.

¶ 44        Second, instead of using leading questions to complete the impeachment of Rachel, the State used an open-ended question, thereby eliciting improper hearsay evidence about what Rachel told Prosser.

¶ 45        We earlier discussed in this opinion the need for a party, when completing a witness's impeachment, to present extrinsic evidence showing that the witness in fact gave the inconsistent statement. The procedure the State used in this case—namely, asking Prosser, the impeaching witness, what Rachel told him in their conversation concerning the incident in question—was improper. The State's open-ended questioning of Prosser resulted in his testifying about various details surrounding the incident that Rachel told him (all of which was inadmissible hearsay), such as that Rachel told Prosser that defendant "got in Byndum's face and began yelling at her and calling her names." Even more important, the State's open-ended questioning of Prosser resulted in the State's failure to present the extrinsic evidence the State was *required* to present—namely, that Rachel had in fact made a statement inconsistent with her testimony at trial.

¶ 46        As earlier discussed, the State asked Rachel whether she told Prosser that defendant twice "choked" Byndum, whereas Prosser, when relating his conversation with Rachel, said that Rachel told him that defendant twice "grabbed" Byndum around the neck. Indeed, the State's

- 7 -

purported attempt at completing the impeachment of Rachel in this case not only was improper, but it could serve as a "poster boy" of what can happen when the correct procedure to complete impeachment is not used.

¶ 47    To sum up, the State's open-ended questioning of Prosser, the impeaching witness, had two bad results: (1) the State never properly completed Rachel's impeachment because Prosser never testified that Rachel made the statement to him that was allegedly inconsistent with her trial testimony, about which she was questioned on cross-examination, and (2) the jury heard Prosser say that Rachel told him "defendant got in Byndum's face and began yelling at her and calling her names." Regarding that last point, we note that Byndum herself *never* testified that defendant so behaved, and even Rachel testified only that defendant and Byndum were arguing and yelling at each other.

¶ 48    Because so much uncertainty seems to exist among trial lawyers regarding the issue of how to complete the impeachment of a witness through the presentation of extrinsic evidence to establish the inconsistent nature of the witness's trial testimony, we offer the following guidance.

¶ 49              4. *Only Leading Questions Should Be Used To Elicit the*
                  *Extrinsic Evidence That Completes Impeachment*

¶ 50    For a long time, Illinois courts have been addressing the appropriate method to be used to complete impeachment. Over 125 years ago, the Illinois Supreme Court in *Campbell v. Campbell*, 138 Ill. 612, 614, 28 N.E. 1080, 1081 (1891), addressed a situation in which a party wished to impeach the testimony of two witnesses by having their allegedly contradictory testimony from the first trial read in its entirety to the jury. The trial court denied this request, explaining that only such parts of their former testimony that were in fact contradictory of their trial testimony would be read to the jury. The supreme court agreed, explaining as follows:

> "This, in our opinion, was entirely correct. The witness might be contradicted by evidence of his former statements under oath, but he was entitled to have his attention first called to those statements specifically, and to make such explanation in regard to them as he could. [Citations.] And on the question of contradiction, it is manifest that no more of the report of the former testimony should be read than is involved in the claimed contradiction. There is no ground, of which we are aware, upon which appellants were entitled to have the balance of the report read to the jury." *Id.*

¶ 51    In 1907, the Illinois Appellate Court addressed the same issue in *Elgin, Joliet & Eastern Ry. Co. v. Lawlor*, 132 Ill. App. 280 (1907). In that case, the railroad sought to impeach Hurley, who was a witness to an accident involving a train and a buggy, with a statement Hurley allegedly made to Hammond that was inconsistent with Hurley's trial testimony. *Id.* at 289-90. The appellate court noted that in an effort to complete the impeachment of Hurley, Hammond (the impeaching witness) was asked "for all that Hurley said" in the conversation with Hammond. *Id.* at 290. The appellate court concluded this was improper procedure, explaining as follows:

> "[The railroad] had asked Hurley two questions only on this subject, namely, whether in his conversation with Hammond at the time and place fixed he had said[,] 'We saw the train coming up the track and heard the whistle, but could not stop the horse in time;' and 'he (meaning [Lawlor]) whipped the horse before he got to the track, and

that is why he could not stop him in time.' Hurley said he did not so state to Hammond. [The railroad] had a right to ask Hammond whether at that time and place Hurley did make these two statements to him, and these questions must have been answered 'yes' or 'no.' *Appellant had no right to its questions calling for all that Hurley said*. \*\*\* No other course will keep out incompetent and immaterial matter, to the peril of which the opposite party ought not to be subjected." (Emphasis added.) *Id.* at 290-91.

The appellate court concluded as follows: "It is improper to ask the witness to relate the entire conversation or to put the question in such a general form as to be calculated to elicit more than the statement made by the first witness in contradiction of his testimony \*\*\*." *Id.* at 291.

¶ 52    The supreme court granted the petition for leave to appeal in the *Lawlor* case and affirmed, agreeing with the appellate court's analysis regarding the questioning of Hammond, the impeaching witness. *Elgin, Joliet & Eastern Ry. Co. v. Lawlor*, 229 Ill. 621, 628, 82 N.E. 407, 408 (1907). The supreme court's decision contained less detail than did the appellate court's decision, but the supreme court did make the following point regarding the questioning of Hammond as the impeaching witness: "The [trial] court was right in sustaining the objection, for the reason that defendant had no right to call for the conversation by asking what Hurley said to the witness. The only right of the defendant was to ask Hammond whether the statements repeated to Hurley were made, and the question would have been answered by yes or no \*\*\*." *Id.*

¶ 53    This issue has arisen more recently in some criminal cases. In *People v. Payton*, 72 Ill. App. 2d 240, 248, 218 N.E.2d 518, 522 (1966), the court wrote the following:

"Before a witness may be impeached by a prior statement, a proper foundation must be laid in order to alert the witness, avoid unfair surprise, and to give the witness a chance to explain. The witness must first be asked as to the time, place[,] and persons involved in the alleged conversation; secondly, he must be asked whether he made a certain contrary statement at that time. \*\*\* When the impeaching witness is produced, the proper course is simply to ask him whether or not the witness to be impeached made the statement in regard to which he has been questioned at that time and place mentioned. *It is improper to ask the impeaching witness to relate the whole conversation.*" (Emphasis added.)

¶ 54    In *People v. Ellis*, 41 Ill. App. 3d 377, 385, 354 N.E.2d 369, 385 (1976), the court addressed a situation in which Pappas was called in rebuttal as the impeaching witness regarding a statement that Harris had allegedly made to Pappas that was inconsistent with Harris' trial testimony. However, the State did not limit Pappas's rebuttal testimony to that statement. Instead, Pappas was allowed to relate the entire conversation he had had with Harris, including some matter prejudicial to the defendant. The appellate court reversed the defendant's conviction, explaining as follows:

"To the extent that Pappas' rebuttal testimony covered matters about which Harris was not cross-examined, it was improper. *For when an impeaching witness is produced, he may testify only concerning the statement in regard to which the prior witness had been questioned.* (*People v. Payton*, 72 Ill. App. 2d 240, 218 N.E.2d 518.) He may not bring out every detail of a lengthy statement. \*\*\* We conclude that most of Pappas' rebuttal testimony was improper. It went well beyond the realm of proper impeachment and directly implicated defendant in the crime. [Citation.]" (Emphasis added.) *Id.* at 385-86, 354 N.E.2d at 376.

¶ 55    More recently, this court reached the same conclusion in *People v. Bunning*, 298 Ill. App. 3d 725, 732, 700 N.E.2d 716, 722 (1998), writing the following:

> "When formulating questions to witnesses to impeach the testimony of another witness, the question should be phrased in such a way as to avoid the possibility of bringing incompetent matters into the trial. A departure from the rule against leading questions is required to avoid any improper reference in the answer. M. Graham, R. Steigmann, W. Brandt, & E. Imwinkelried, Illinois Evidentiary Foundations 139 (2d ed. 1997); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 613.3, at 516 (6th ed. 1994).
>
> Impeachment of a witness may occur procedurally in a party's case in chief or in the form of rebuttal. Here the impeachment was in the context of a rebuttal witness for the purpose of proving another witness made a prior statement contrary to the statement testified to. It was proper to ask Culp whether the statement of Crystal Bunning was made to Culp and the answer to be made, yes or no. Where the witness is presented in this context, it is proper to refer to the specific statement in asking for a yes or no answer. *Elgin, Joliet & Eastern Ry. Co. v. Lawlor*, 229 Ill. 621, 628, 82 N.E. 407, 408 (1907)."

¶ 56    Thus, in the present case, to complete Rachel's impeachment, the State was required to call Prosser, the impeaching witness, to testify in rebuttal. Through Prosser's testimony, the State needed to present extrinsic evidence of Rachel's prior statement to Prosser that the State maintained was inconsistent with her trial testimony. To do so, the State needed first to establish that Prosser had a conversation with Rachel about the incident in question, asking generally where and when the conversation occurred and who was present, if anyone, besides Rachel and Prosser. Then the State should have asked a *leading* question, literally calling for only a yes or no answer, as follows: "During that conversation, did Rachel tell you that the defendant choked her friend, Byndum, twice?" Assuming, for the moment, Prosser would have answered yes to that question, then the impeachment of Rachel would have been completed and no further testimony from Prosser about what Rachel told him during that conversation *would be either necessary or admissible*. That is because everything Rachel told Prosser in their conversation constituted inadmissible hearsay *except* Prosser's testimony about Rachel's prior inconsistent statement. Had this procedure been followed, Prosser would not have had the opportunity to tell the jury that Rachel told Prosser how "defendant got in Byndum's face and was yelling at her and calling her names," all of which was prejudicial to defendant and *entirely* inadmissible.

¶ 57    We earlier described this case as "the poster boy" for what can go wrong when proper procedures are not used to complete impeachment, and by that we mean the impeaching witness—here, Prosser—should *never* be asked what his recollection of the conversation at issue may be. Aside from the fact that none of his recollection is pertinent or admissible *except* for the narrow and limited purpose of establishing the prior inconsistent statement, an open-ended question to the impeaching witness could result in a surprise to everyone. After all, the impeaching witness might well be testifying (as here) several months after the conversation at issue occurred, and the impeaching witness's testimony about that conversation could in all honesty be based upon that witness's *current* recollection. Thus, in the present case, when Prosser testified about his conversation with Rachel, his testimony that Rachel told him that the

- 10 -

defendant "grabbed" Byndum by the neck twice was no doubt his then-current, honest recollection of that conversation.

¶ 58    On the other hand, if the prosecutor before trial had discussed Prosser's testimony with him (as she should have done) before (1) confronting Rachel on cross-examination with her prior statement to Prosser that was allegedly inconsistent with her trial testimony and then (2) calling Prosser as the impeaching witness, she might have refreshed his recollection with his reports showing that the term Rachel used in that conversation was that defendant "choked" Byndum twice. Under these circumstances, it is possible that Prosser, with his recollection having been refreshed, could have testified accurately and honestly that Rachel used the term "choked."

¶ 59    Further, if after an attempt to refresh Prosser's recollection during such a pretrial conference between the prosecutor and Prosser, Prosser still remembered Rachel as using only the term "grabbed" instead of "choked," then the prosecutor would know not to ask Rachel during her cross-examination by the State if Rachel told Prosser that she saw the defendant "choke" Byndum twice. The prosecutor instead would know to use the term "grabbed" when cross-examining Rachel.

¶ 60    We earlier referred to the *Williams* decision of the supreme court, explaining that before an attorney may confront a witness on cross-examination with an alleged prior inconsistent statement, that attorney must have a good-faith basis to believe that if the witness denies making the statement, the attorney will be able to complete the impeachment by presenting extrinsic evidence that the statement was in fact made. Here, unless in pretrial preparation Prosser told the prosecutor that Rachel used the term "choked," the prosecutor should never have confronted Rachel with that term during her cross-examination.

¶ 61    Assuming the prosecutor had in good faith confronted Rachel with the term "choked" because the prosecutor believed that Prosser would so testify as the impeaching witness, then the prosecutor erred by using improper procedure to complete Rachel's impeachment—namely, her asking an open-ended question. This resulted in Prosser's use of a different word—"grabbed"—when describing what Rachel told him than what the prosecutor expected Prosser would say.

¶ 62    If Prosser simply made a mistake by using the term "grabbed," instead of "choked," when describing what Rachel told him, that mistake is understandable, given the closeness of these terms. Yet that mistake highlights why, to avoid this situation, it is necessary that *only leading questions must be asked of the impeaching witness to establish the prior inconsistent statement.*

## B. Vouching for the Credibility of a Witness

¶ 64    Defendant argues that he was denied a fair trial because the State impermissibly vouched for a witness's credibility during its closing argument. We disagree.

¶ 65    The State made the following pertinent comments during its closing argument:

> "So what we have is the account of Byndum, a 17-year-old, employed, high school graduate, a nice young lady, who told you—and it's not easy—she got up there and told you what happened that day. She told you what's cost her this important friendship [with Rachel] and that she's telling the truth."

* * *

Consider, as I believe [the] Judge *** will tell you in a few moments, the motive, interest[,] and bias of anyone who testified. What on earth does [Byndum] have to gain? She was the one who had her phone taken from her and ended up grabbed by somebody she ostensibly [k]new and trusted who's the big brother to her best friend since sixth grade."

¶ 66    During rebuttal closing arguments, the State commented, as follows:

"The emphasis that is being placed on *** defendant's testimony and his relative's testimony, again, bias, motive. Consider what everybody has to gain in this. All Byndum has done is lose. She lost her phone for a couple of minutes. She lost her [best] friend. She lost confidence in somebody who she has spent time with, [that] being the defendant. She lost a group of people she's known for the better part of her life *** who she socialized with. She was under the exact same pressure that everybody else was, that [defense counsel] mentioned earlier, this great pressure to be on the stand and her testimony should be considered by you quite strongly."

¶ 67    "During closing argument, prosecutors are granted wide latitude," but when a prosecutor expresses "personal beliefs or opinions or invoke[s] the State's Attorney's office's integrity, to vouch for a witness's credibility," the prosecutor breaches that latitude. *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66, 44 N.E.3d 632. Closing arguments are viewed in their entirety, and the challenged remarks are considered within the context in which they were conveyed. *Id.* We review *de novo* whether a prosecutor's statements delivered during closing arguments warrant reversal and remand for a new trial. *Id.* "Reversal is not warranted unless the improper remarks result in substantial prejudice to the defendant." *Id.*

¶ 68    Defendant acknowledges that he has forfeited review of this claim because he failed to (1) object contemporaneously to the closing remarks he now challenges and (2) file a posttrial motion on that issue. Nonetheless, he requests this court to review his claim regarding the State's closing argument under the plain-error doctrine. However, we need not address defendant's admitted forfeiture because we choose to consider whether any error was committed in the prosecutor's closing argument. For the reasons that follow, we conclude that defendant has not established any error, much less plain error.

¶ 69    Although defendant cites the aforementioned portions of the State's closing argument to establish his claim of plain error, defendant concedes that "the State did not explicitly say that it personally believed that [Byndum's] testimony was credible." Defendant claims instead that "[a] commonsense reading of the comments clearly shows that the State intended [to] convey to the jury that it believed [Byndum's] testimony to be credible, and therefore the jury should as well." In support of his contention, defendant directs our attention to *People v. Effinger*, 2016 IL App (3d) 140203, 53 N.E.3d 985, claiming that the aforementioned argumentative comments in this case were similar to those conveyed in *Effinger*. We are not persuaded.

¶ 70    In *Effinger*, the State expressed to the jury during its closing argument that, " 'I will put forth that [the victim] was credible and you should believe her.' " *Id.* ¶ 12. During its rebuttal closing argument, the State remarked, " 'we believe [the victim is] credible, that she told—everything she said was completely credible and makes perfect sense as to how everything happened.' " *Id.* Although the appellate court in *Effinger* concluded that the State's comments impermissibly vouched for the victim's credibility, the court further concluded that they did not amount to plain error under the first prong of the plain-error analysis. *Id.* ¶¶ 25-26.

We conclude that *Effinger* does not offer defendant any support and is easily distinguishable from the facts of this case.

¶ 71 In this case, the portions of the State's closing argument and rebuttal closing argument about which defendant complains occurred in the context of arguing to the jury that the evidence presented showed that Byndum was a responsible young lady who had no motive to fabricate a tale about defendant's choking her because to do so would result in her losing her long-established friendship with Rachel, as well as others. In other words, the State was arguing that Byndum was a credible witness that the jury should believe, which was an entirely appropriate argument. See *People v. Sebby*, 2015 IL App (3d) 130214, ¶ 60, 32 N.E.3d 689 (" '[T]he credibility of a witness is a proper focus of closing argument if it is based on the evidence or reasonable inferences drawn from the evidence.' " (quoting *People v. Dresher*, 364 Ill. App. 3d 847, 859, 847 N.E.2d 662, 672 (2006))).

¶ 72 Because we conclude that no error occurred, we need not engage in a plain-error analysis, and we honor defendant's forfeiture of his closing-argument claim.

¶ 73                                          C. Fines and Fees

¶ 74 Defendant argues that he was entitled to a $100 presentence credit against his eligible fines. The State concedes that defendant is entitled to the $100 presentence credit but argues that remand is required to calculate the correct sentencing credit, which the State believes is $610 instead of $615. We accept the State's concession and remand for further proceedings.

¶ 75 Section 110-14(a) of the Code provides that "[a]ny person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." 725 ILCS 5/110-14(a) (West 2014).

¶ 76 In this case, defendant was charged with aggravated battery in that he choked another individual, which is a bailable offense. The record reflects that defendant was incarcerated awaiting trial on that charge from October 20, 2014, until he was sentenced by the trial court on February 19, 2015. At defendant's sentencing hearing, the trial court (1) imposed a five-year prison sentence and fines totaling $100 and (2) awarded defendant a sentence credit of $615 that defendant could apply to his applicable fines (123 days multiplied by the $5 per day credit).

¶ 77 The parties agree that defendant is entitled to have $100 of his sentencing credit applied to the following fines: (1) $30 juvenile expungement fund assessment (730 ILCS 5/5-9-1.17(a) (West 2014)), (2) $5 drug court assessment (55 ILCS 5/5-1101(f) (West 2014)), (3) $15 state police operations assistance fee (705 ILCS 105/27.3a(1.5) (West 2014)), and (4) $50 court finance fee (55 ILCS 5/5-1101(c)(1) (West 2014)). We agree with the parties that defendant is entitled to a full credit against the aforementioned fines and remand the matter to the trial court to amend the sentencing judgment to reflect the appropriate credit.

¶ 78 In its brief to this court, the State challenges the trial court's computation of defendant's sentencing credit, arguing that the trial court incorrectly calculated the days of his presentence incarceration as defendant should not have received credit on the day of his sentencing. See *People v. Alvarez*, 2012 IL App (1st) 092119, ¶ 71, 970 N.E.2d 516 ("The day of sentencing is not included in calculating a defendant's presentence credit."). We decline to address the

State's argument and, instead, invite the State to pursue its claim in the trial court on remand.

¶ 79                                    III. CONCLUSION

¶ 80        For the foregoing reasons, we (1) affirm defendant's conviction and five-year sentence and (2) remand this cause to the trial court for issuance of an amended sentencing judgment to reflect the proper monetary credit to defendant's imposed fines.

¶ 81        Affirmed; cause remanded with directions.