THIRD DIVISION
June 13, 2007

No. 1-05-2429

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| MANUEL SUASTEGUI, | ) ) ) | Honorable |
| Defendant-Appellant. | ) ) ) | Fred G. Suria, Jr., Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Manuel Suastegui was convicted of first degree murder and was sentenced to 45 years' imprisonment. On appeal, defendant contends: (1) the trial court erred in denying defendant's motion to dismiss the indictment; (2) the trial court erred in excluding defendant's exculpatory evidence; (3) the evidence was

insufficient to sustain his conviction; (4) his sixth amendment rights were violated because testimonial evidence was admitted without the opportunity for cross-examination; and, (6) photographs of his tattoos were irrelevant and the admission thereof was highly prejudicial. We affirm the judgment of the trial court.

On September 26, 1995, at about 9:15 p.m., the victim, Daniel Matias, was shot and killed near 1745 North Keystone Avenue in Chicago. Jessica Rivera was walking with the victim at the time but was not harmed. According to Rivera, she did not see the shooter. Another individual, Christina Herrera, also witnessed the shooting. At trial, Herrera testified that she saw a person standing on top of the railroad viaduct shoot at the victim, who was walking on the street below. The person who was shooting had dark clothing and was wearing a black hoody. She did not see the shooter's face.

Dr. Edmund Donoghue performed an autopsy on the victim. He testified that the victim had been shot five times and the wounds were consistent with being shot from an elevated location. Dr. Donoghue recovered bullet fragments from two locations within the body, but could not determine what type of bullets they were from. He further stated that the victim had several tattoos, including a "YLO" tattoo.[1]

Several years later, in January 1998, Ignacio Salgado was arrested for selling narcotics. He was questioned about the victim's murder and gave a statement

---

[1]"YLO" refers to the street gang Young Latin Organized Disciples.

2

implicating defendant. Defendant was subsequently arrested for the victim's murder in September 1999.

Salgado testified at trial that in 1995, he was a member of the Insane Spanish Cobras (Spanish Cobras) street gang. At that time, the Cobras were "at war" with another gang, the Young Latin Organized Disciples (YLO Disciples). Salgado stated that the president of the section of the Spanish Cobras of which he was a member was Ramiro Alvarez, who also went by the nickname Tiger. The section was referred to as "Keeler and Dickens," which referred to the street names that encompassed the gang's boundaries. He stated that defendant was also a member of the Spanish Cobras and went by the nickname Gato. Defendant served as an "enforcer," which meant that he helped enforce the laws of the gang. Alvarez called weekly meetings, and at the meeting shortly before the victim was shot, Alvarez told the members that they had to "take care of business" and "pop a D," which Salgado explained meant to shoot a YLO Disciple. Alvarez pulled a couple of people aside, including defendant and another individual, Andy Montanez. Salgado saw Alvarez hand defendant a gun. About 5 to 10 minutes later, while Salgado was at a taco stand at the corner of Keeler Avenue and Armitage Avenue, he heard gunshots coming from the nearby train tracks. Shortly thereafter, he saw defendant run past him from the direction of the train tracks. Defendant told Salgado that he "shot a D." Salgado stated that defendant was carrying a revolver and it looked like the same gun that was given to defendant at the meeting. He described the revolver as blue.

On cross-examination Salgado admitted that during his grand jury testimony, he had testified that defendant served as a soldier in the gang, rather than an enforcer. He also admitted that he had testified before the grand jury that the revolver was black, rather than blue. He further admitted that he had not told police officers or the grand jury that he heard gunshots prior to seeing defendant run past him. He also stated that he did not tell police officers about the gang's weekly meetings. Salgado also stated that when he saw defendant running, he saw that defendant had something in his hand, but was not sure whether it was a gun. Salgado further admitted that he pled guilty and received probation for the charges stemming from his arrest for selling narcotics.

Sergeant Anthony Wojcik testified that defendant was arrested on September 1, 1999, at about 5:30 p.m. At about 10:15 p.m., Sergeant Wojcik and his partner advised defendant of his Miranda rights and interviewed defendant for about 45 minutes to an hour. Defendant told them that he had been a member of the Spanish Cobras from the age of 13 to the age of 18 or 19. Defendant indicated that the knew Alvarez and Salgado. The officers took pictures of his tattoos and ended the interview. At about 1:30 a.m. the next day, defendant was interviewed again. After reading defendant his Miranda rights, they specifically told him that they were investigating the victim's murder. Sergeant Wojcik stated that defendant began shaking and pacing and they took him to the bathroom, where he was sick. Defendant denied knowing anything about the murder. The interview ended at about 3 a.m. At about 5 a.m., defendant was read his Miranda rights and was interviewed again. Defendant identified the victim,

4

whom he knew by the name "Snoop." Defendant told officers that the Latin Kings had killed the victim. Officers showed defendant a picture of Montanez and told defendant that they had been told a different story. Defendant then told officers that Montanez shot the victim and that he was with Montanez at the time. At about 10 a.m., defendant was interviewed by an assistant State's Attorney.

Sergeant Wojcik further testified that in 1998, the Chicago police department launched an operation in which they attempted to obtain information on several unsolved gang-related murders. Undercover officers would buy narcotics from gang members, arrest them, and then attempt to obtain information regarding the unsolved murders. Officers did not offer any "deal" or "quid pro quo" for a gang members' cooperation. He stated that Salgado was arrested as a result of the operation.

Assistant State's Attorney Christine Stephens testified that she read defendant his Miranda rights before interviewing him and the interview lasted about an hour. Defendant told Stephens that on the night the victim was shot, defendant encountered Montanez at the corner of Keeler Avenue and Dickens Avenue. Montanez was carrying a revolver. Montanez indicated that a Spanish Cobra had been beaten by a YLO Disciple earlier that evening and that he wanted to "take care of the D's." Defendant and Montanez walked toward Cortland Street and Keystone Avenue, which was the YLO Disciples' territory. They were walking along the train tracks when Montanez pointed the revolver down toward the street and shot five times. Defendant later heard that the victim had been shot. Defendant did not mention encountering Salgado at a

5

taco stand.  Defendant further indicated that he only acted as a lookout while Montanez shot the victim.

On appeal, defendant first contends that the trial court erred in denying his motion to dismiss the indictment.  Defendant argues that he was indicted pursuant to the "Illinois Compiled Statutes 1992, as amended," and because the Illinois Compiled Statutes did not become effective until 1993, his conviction is based on a nonexistent statute and is void.

Defendant's indictment for first degree murder stated in part:

"They without lawful justification shot and killed Daniel Matias with a gun knowing that such shooting with a gun created a strong probability of death or great bodily harm to Daniel Matias, in violation of Chapter 720, Act 5, Section 9-1-A(2) of the Illinois Compiled Statutes 1992, as amended."

Public Act 87-1005, which became effective on September 3, 1992, modified and amended the Legislative Reference Bureau Act (25 ILCS 135/1 et seq. (West 1992)) and replaced the organizational and numbering scheme of the Illinois Revised Statutes with the Illinois Compiled Statutes.  Section 5.04(a) provided that the reorganizing and renumbering or "compilation" shall take effect on January 1, 1993.  However, section 5.04(e) provided that "reports of criminal, traffic, and other offenses and violations that are part of a state-wide reporting system shall continue to be made by reference to the Illinois Revised Statutes until July 1, 1994, and on and after that date shall be made by reference to the Illinois Compiled Statutes."  Pub. Act 87-1005 §5.04(e) (1992).

6

Throughout section 5.04, which is entitled "Codification and revision of statutes," the Illinois Compiled Statutes, or ILCS, are referred to as an "organizational and numbering scheme." Nowhere in that section does it state that the statutes themselves are new or that the Illinois Revised Statutes are no longer in existence. Section 5.04 merely states that Illinois statutes will no longer use their Illinois Revised Statutes citation, but will be reorganized and renumbered and will be cited as Illinois Compiled Statutes.

We disagree with defendant's contention that because the Illinois Compiled Statutes did not become effective until 1993, defendant was indicted pursuant to a nonexistent statute. Regardless whether defendant's indictment for first degree murder used the Illinois Revised Statutes citation or Illinois Compiled Statutes citation, the first degree murder statute was in existence before, during and after defendant's indictment. Defendant's indictment merely referred to the first degree murder statute by a new number and designation. Defendant was not charged under a new law. Therefore, we find that defendant was properly charged with violating the first degree murder statute despite the indictment's citation to the "Illinois Compiled Statutes 1992, as amended." Moreover, defendant does not argue that the indictment failed to adequately set forth "the nature and elements of the offense charged," as required by section 111-3(a)(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a)(3) (West 1998)) and both the United States Constitution (U.S. Const., amend. VI) and the Illinois Constitution (Ill Const. 1970, art. I, §8).

7

Next, defendant contends that the trial court erred when it excluded defendant's exculpatory evidence. Specifically, defendant argues that the trial court prevented him from calling Jessica Rivera to testify that she had identified someone other than defendant as the shooter. Defendant maintains that her testimony was admissible pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2004)).

The trial record reveals the following with respect to Rivera. At the time of the shooting, Rivera told police officers that she did not see the shooter. Subsequently, a police report compiled in 1997 indicated that Rivera identified the shooter as a person named Diego LaLuz. However, prior to trial, Rivera spoke with Assistant State's Attorney Thomas Darman as well as defendant's investigator, and she denied identifying LaLuz as the shooter and maintained that she did not see the shooter. Defendant subpoenaed Rivera to testify at trial; however, she refused to appear. The State objected to her testimony on the basis that her testimony did not come within the purview of section 115-10.1 of the Code. The trial court agreed and denied defendant's request to call Rivera as a witness.

Section 115-10.1 of the Code provides in part:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

8

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement - -

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording."  735 ILCS 5/115-10.1 (West 2004).

Here, defendant sought to introduce Rivera's alleged prior statement that Diego LaLuz shot the victim as substantive evidence to support defendant's position that he did not shoot the victim.  "'Substantive evidence is evidence which is "adduced for the

purpose of proving a fact in issue, as opposed to evidence given for the purpose of discrediting a witness * * * or of corroborating his testimony." [Citation.]'" People v. Posedel, 214 Ill. App. 3d 170, 177 (1991), People v. Redd, 135 Ill. 2d 252, 302 (1990), quoting Black's Law Dictionary 1281 (5th ed. 1979). Unless a prior inconsistent statement qualifies under section 115-10.1, it is not admissible as substantive evidence. The determination of whether evidence is relevant or admissible is a matter within the discretion of the trial court, and we will not reverse such a determination unless the trial court abuses that discretion. People v. Singleton, 367 Ill. App. 3d 182, 189 (2006).

Defendant does not argue that Rivera's alleged statement was admissible pursuant to section 115-10.1; rather, defendant argues that the trial court erred because it prevented the defense from calling Rivera "at all." Defendant maintains that the trial court should have allowed defendant to call Rivera "in order to determine whether she would [have] acknowledge[d] the prior statement under oath" and then the court could have determined whether the statement would have been admissible pursuant to section 115-10.1. Defendant contends that the trial court prevented him from presenting a defense by excluding Rivera as a witness.

Here, it is clear from the record that had the trial court permitted Rivera to testify, her alleged prior inconsistent statement would have been inadmissible. Defendant sought to introduce the inconsistent statement as substantive evidence to support his position that someone else shot the victim. In order to introduce the statement as

10

substantive evidence, the statement needed to satisfy the criteria in section 115-10.1. Because Rivera continued to deny making the prior inconsistent statement, defendant could not satisfy subsection (B), which required the witness to acknowledge making the statement under oath. The record belies defendant's contention that had Rivera not been excluded she "may have" acknowledged her inconsistent statement under oath. The record indicated that Assistant State's Attorney Darman and defendant's investigator spoke with Rivera prior to trial and Rivera indicated that she did not know who the shooter was and denied ever telling officers otherwise. There is no indication that Rivera would testify any differently. We conclude that Rivera's testimony would not have satisfied the criteria in section 115-10.1 and the trial court's ruling excluding her testimony was not an abuse of discretion.

Next, defendant contends that the evidence was insufficient to sustain his conviction. Defendant argues that Salgado's testimony was not credible and the oral statement attributed to defendant failed to prove he was accountable for the victim's murder.

When considering the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. People v. Young, 128 Ill. 2d 1, 49 (1989). We will not reverse a conviction on grounds of insufficient evidence unless that evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. People v. Furby, 138 Ill. 2d 434,

11

1-05-2429

455 (1990).

A person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 1998)); People v. J.H., 136 Ill. 2d 1, 17 (1990).

Here, the jury found defendant guilty beyond a reasonable doubt. Although defendant claims that Salgado's testimony was not credible, the jury heard his testimony as well as the several inconsistencies pointed out by defense counsel during cross-examination. Specifically, the jury was apprised of Salgado's inconsistent testimony regarding the color of the gun, defendant's rank in the gang, whether Salgado actually saw defendant holding a gun after the shooting, and that Salgado had not told officers about the gang's weekly meetings or that he had heard gunshots before defendant ran past him. Nevertheless, defendant's oral statement to Assistant State's Attorney Stephens in which he admitted being present at the scene corroborated Salgado's testimony that defendant was near the scene of the shooting at the time the shooting occurred. And, defendant's oral statement that he acted as a lookout for Montanez was sufficient to find defendant guilty based on a theory of accountability. Further, Sergeant Wojcik testified that there was no "quid pro quo" for Salgado's cooperation with officers. Despite the inconsistencies in Salgado's testimony, we find that there was sufficient evidence to sustain defendant's conviction.

12

Next, defendant contends that his sixth amendment rights were violated when testimonial evidence was admitted without the opportunity for cross-examination. He argues that Sergeant Wojcik's statement that Andy Montanez corroborated Salgado's testimony violated his sixth amendment right to be confronted by the witnesses against him pursuant to <u>Crawford v. Washington</u>, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004).

During defendant's cross-examination of Sergeant Wojcik, the following colloquy occurred:

"[Mr. Lopez]: After you spoke to Andy, then you went out to look for Ramiro Alvarez, is that right?

[Wojcik]: Well, we talked to Andy, and he corroborated what [Salgado] told us. So, at that point, we want to speak to [Salgado] again."

Defendant maintains that the statement that Montanez corroborated Salgado's testimony was testimonial and defendant was prejudiced because he was not able to cross-examine Montanez because Montanez asserted his fifth amendment rights and did not testify at trial.

We first note that defendant did not object to Sergeant Wojick's testimony at trial. However, defendant did include the issue in his second posttrial motion.[2]

---

[2] The record indicates that defendant filed two posttrial motions. The first motion entitled "Motion For a New Trial or Judgment of Acquittal" was filed on March 31, 2004.

13

Nevertheless, in order to preserve an issue for appeal, a party must both object at trial and raise the issue in a posttrial motion. See People v. Enoch, 122 Ill. 2d 176, 186 (1988). Defendant has failed to preserve the issue for appeal. Waiver aside, the statement that Montanez corroborated Salgado's testimony was not testimonial; rather, it showed the course of conduct that officers took to investigate the shooting. The statement was not offered to prove any issue, but was responsive to defendant's questions about how the police investigation proceeded. We disagree with defendant's contention that the statement violated his sixth amendment rights to be confronted by the witnesses against him.

Lastly, defendant contends that the trial court erred when it introduced photographs of his tattoos, which were irrelevant and highly prejudicial. During Sergeant Wojcik's testimony, the State questioned Sergeant Wojcik about the photographs taken of defendant and his tattoos at the time of his arrest.

Defendant had a tattoo of "SC," which allegedly referred to the Spanish Cobras. He had a tattoo of "Mi Vida Loca," which allegedly stood for "my crazy life." Another tattoo showed a diamond with an "SC" and upside down pitchforks. Sergeant Wojcik stated that a diamond is the Spanish Cobras' insignia and upside down pitchforks

---

The second motion entitled "Motion of Acquittal Notwithstanding the Verdict and/or For New Trial" was filed on May 3, 2005. It is unclear from the record whether the court ruled on defendant's first motion.

14

showed disrespect to the Disciples. Defendant also had a diamond tattoo on his ankle and another tattoo that said "love mom." Defendant maintains that the photographs of the tattoos served no purpose other than to inflame the jury and there was no evidence that he had the tattoos at the time of the victim's murder in 1995.

Evidence that the defendant was a member of a gang or participated in gang-related activities may be admissible at trial, despite its prejudicial effect, to establish a common purpose or design or to provide a motive for an otherwise inexplicable act. People v. Patterson, 154 Ill. 2d 414, 458 (1992). However, the evidence's prejudicial effect must not substantially outweigh its probative value. People v. Fluker, 318 Ill. App. 3d 193, 204 (2000). The trial court's ruling is not to be overturned on appeal unless a clear abuse of discretion is shown. People v. Hamilton, 328 Ill. App. 3d 195, 202 (2002).

Here, defendant did not object to the introduction of the photographs during Sergeant Wojcik's testimony, but did raise the issue in his second posttrial motion. In order to preserve an issue for review, there must be an objection at trial and the issue must be raised in a posttrial motion. Enoch, 122 Ill. 2d at 186. Defendant has failed to preserve the issue for appeal. Waiver aside, the tattoos were relevant to show defendant's participation in the Spanish Cobras. The entire case was about the "war" between the Spanish Cobras and the YLO Disciples, and the Spanish Cobras' need for retaliation, which was the reason for the victim's murder. Defendant's tattoos helped to illustrate this point. The tattoos themselves merely depicted the Spanish Cobras'

15

symbols and did not contain additional language or illustrations that would be inflamatory or prejudicial to defendant. We find no abuse of discretion in the admission of the photographs of defendant's tattoos.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.