2022 IL App (1st) 191920-U

SECOND DIVISION
September 27, 2022

No. 1-19-1920

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 7189 |
| | ) | |
| EMMANUEL RAYA, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirmed. Though it was error to admit photographs of defendant's gang tattoos containing swastikas, and accompanying expert testimony that gang founder "idolized Adolf Hitler," defendant cannot show either ineffective assistance or reversible evidentiary error, as error would not have affected jury's verdict.

¶ 2    A jury convicted defendant Emmanuel Raya of the first-degree murder of Jeanette Laureano. The State's theory was that defendant shot Jeanette in tribute to one "Omski," a fellow Maniac Latin Disciple who had been killed by Spanish Cobras, a rival gang with whom Jeanette associated. In support of this theory, the State offered ten photos of defendant's numerous gang tattoos and a gang expert's testimony about Omski's murder, the gang feud that arose from it, and its alleged relevance to this shooting.

¶ 3    Two of defendant's tattoos depict swastikas. As the State's expert testified, the swastika

was adopted as one of the Maniac Latin Disciples' symbols because the gang's founder "idolized Adolf Hitler." Defendant argues on appeal that the swastika tattoos, and the expert's testimony about their significance, had no relevance to Jeanette's murder and were highly inflammatory and thus prejudicial.

¶ 4     Defendant seeks relief on alternative theories of ineffective assistance of counsel and preserved evidentiary error by the trial court. On either theory, the result is the same: we agree with defendant that it was error to admit the Nazi-themed evidence, as it was far more prejudicial than probative, but we do not find any reasonable probability that the State's use of this improper evidence swung the verdict in its favor. Thus, whether viewed as a lack of prejudice in an ineffective-assistance claim or as harmless error, we affirm defendant's conviction on this basis.

¶ 5                                    BACKGROUND

¶ 6                                  I. The shooting

¶ 7     On March 18, 2016, Jeanette Laureano parked in front of a convenience store at Diversey and Kilbourn Avenues, in Spanish Cobra territory. Though Jeanette was not officially a Spanish Cobra, she did closely associate with members of that gang. Her cousin, Hector Laureano, got out of the minivan and walked toward the store. Someone shouted "Cobra Love" from a passing car. Hector, who was a Spanish Cobra, flashed the gang's hand symbols and yelled, "DK"— short for "disciple killer," a reference to the gang's rivals, the Maniac Latin Disciples.

¶ 8     In short order, an armed man stepped out of a black Mercedes that was following a few cars behind on Diversey. Realizing that he'd been lured into admitting his affiliation, Hector ran back to Jeanette's minivan, banged on the hood to warn her of the approaching danger, and kept running. The man walked up to the driver's side window; fired several shots at close range, killing Jeanette; and got back into the Mercedes, which sped away down Kilbourn.

¶ 9    The shooting was captured on the store's surveillance camera, but the shooter's face was obscured and thus unidentifiable in the video. The evidence implicating defendant as the shooter came from three principal sources: two eyewitness identifications; Blanca Camacho, the owner and driver of the black Mercedes; and the gang evidence at issue here.

¶ 10                              II. Eyewitness identifications

¶ 11    Based on information gleaned from a variety of sources, Detective Arthur Taraszkiewcz of the Chicago Police Department (CPD) assembled a photo array that included defendant and showed it to Hector and four other witnesses. None of these witnesses identified defendant when they first viewed the photo array.

¶ 12    Detective Taraszkiewcz testified that gang members are often reluctant to cooperate with the police. Hector was a case in point. When he first viewed the photo array, he was not sure that he *wanted* to make an identification, although he did think that he was *able* to. (He thought the shooter was #4 in the array.) Hector wanted to check in with his aunt—Jeanette's mother—to see what she wanted him to do, and to figure out whether the matter was going to be "handled by the streets" before he cooperated with the police. After speaking to Jeanette's mother, Hector decided to cooperate. He went back to the station and identified defendant from the same array.

¶ 13    Celestino Banuelos and Romiro Jimenez, both Spanish Cobras, were in the van when Jeanette was shot. Banuelos described the shooter as "kind of light-skinned," with a small, light-blue tattoo under his eye. But that is as far as he went. According to Detective Taraszkiewcz, Banuelos did not want to be involved with the Maniac Latin Disciples; as he told the detective, "I don't need those kind of problems."

¶ 14    Detective Taraszkiewcz described Jimenez as "a hard-core Spanish Cobra" who "would hardly even look at" the detectives and seemed to take "a certain amount of satisfaction" in being

"intentionally uncooperative" with the police.

¶ 15    Ruth Martinez, an acquaintance of Jeanette's, and Martinez's roommate Jennifer Bennett, were standing near the van, talking to Jeanette, when the shooter approached. Unlike the other witnesses, Martinez and Bennett had no gang affiliation; they just happened to be at the store, buying drinks, when they saw Jeanette and stopped to chat. As the shooter approached, they backed away from the minivan.

¶ 16    Bennett testified that the shooter wore a black hoodie, but it did not cover his face, which she was thus able to see, albeit briefly. When she viewed the photo array, one person "looked familiar" to her, but she "wasn't sure based on the picture alone," and she "didn't want to pick the wrong person." She told the detective that she "would have felt more comfortable seeing him in person," so she was brought back to the station a couple weeks later to view a live, four-person lineup. She identified defendant.

¶ 17    Like Bennett, Martinez did not identify anyone from the photo array and later viewed the live lineup. Unlike Bennett, however, Martinez did not identify defendant. Rather, she identified one of the fillers. Martinez testified that she was not wearing her glasses when she saw the shooting; she went to the convenience store right after Bennett woke her up from a nap and forgot to put them on.

¶ 18    Although the security footage does not reveal the shooter's face, it does reveal that the shooter was left-handed. (Or at least a left-handed shot.) For what it's worth, it was undisputed at trial that defendant is left-handed.

¶ 19                                III. Blanca Camacho

¶ 20    The license plate of the black Mercedes was traced to Blanca Camacho. Camacho knew defendant well. She testified that he was a Maniac Latin Disciple who went by the street name

"Horny D." Camacho and defendant had been dating for a few months, and in November 2016 (8 months after the shooting) they had a child together. Camacho had previously dated defendant's cousin for 16 years and had three children with him.

¶ 21    Defendant asked Camacho to pick him up at Hermosa Park, near Kenneth and Belden, in Maniac Latin Disciple territory. In due course, defendant directed her to Kilbourn and Diversey. Along the way, Camacho got the sense that they were following someone a few cars ahead of them. There was another man who came along with defendant, but Camacho did not know him.

¶ 22    Defendant got out of the car at the intersection of Kilbourn and Diversey. Camacho saw something in his hand, but she did not know, at the time, what it was. Camacho heard gunshots but did not see the shooting. She asked the other man what was going on; he said nothing. Defendant got back into the car, told Camacho to drive, and screamed something about "Umski" [*sic*]. Camacho did not understand what he was saying. She also heard "a lot of clicking" coming from the backseat, where defendant was sitting, that "sounded like a gun." Defendant ultimately directed Camacho to drop them off at Kenneth and Belden. As he got out of the car, defendant said, "that's what he get."

¶ 23    Scared that defendant had just put and her children in harm's way, Camacho abandoned her Mercedes near Belmont and Harlem. Defendant came to her house the next day and asked, among other things, where the car was, because he "needed to get rid of it." Camacho told him. The police never found Camacho's Mercedes.

¶ 24    Indeed, the police had searched in vain for the Mercedes, for over two weeks, before arresting Camacho and questioning her as a suspected accomplice in the murder. Camacho was interrogated for upwards of two days before she implicated defendant, and then only after the detectives showed her the security video in which the shooter is seen arriving at, and then

leaving, the murder scene in her car. According to the detectives, although Camacho evidently lied about any number of things before changing her tune—she was, to be sure, in no hurry to implicate defendant, or in general to say anything more than necessary—she never wavered on her claim that she did not know that defendant had a gun, or that he planned to kill anyone, when she gave him a ride to Kilbourn and Diversey. Camacho was never charged.

¶ 25　The defense vigorously attacked Camacho's credibility on this point, painting her as a knowing and thus complicit getaway driver. The trial court agreed with the defense's argument that there was enough evidence of Camacho's potential involvement in the offense to instruct the jury, pursuant to the accomplice-witness instruction in IPI 3.17, that her testimony was "subject to suspicion and should be considered by you with caution." Illinois Pattern Jury Instruction, Criminal 4th, No. 3.17.

¶ 26　The defense also sought to rebut Camacho's testimony by presenting an alibi defense. Defendant's brother, Rickey Raya, testified that defendant had been his primary caregiver since he became a paraplegic after being shot in 2001. Defendant and Rickey lived together, with their father. Defendant was caring for Rickey and never left the house on the day of the shooting.

¶ 27　Rickey also testified that defendant looked a lot like his cousin, Manuel, with whom Camacho had three children. Elaborating on this theme, the defense argued that Camacho pointed the finger at defendant to protect Manuel. By the time of trial, Manuel was deceased.

¶ 28　　　　　　　　　　　　IV. Gang evidence

¶ 29　The State called CPD Officer Eric Miehle as a gang expert. His testimony was relevant primarily to the State's theory of motive. Officer Miehle testified, in sum, to the ongoing rivalry between the Maniac Latin Disciples and the Spanish Cobras. He delineated the gangs' respective territories for the jury and explained that, since the leaders of many of Chicago's principal gangs

were successfully targeted by law-enforcement in the 1990s, the gangs had largely splintered into factions, each claiming their own territory within the gang's turf.

¶ 30    Defendant belonged to the Kenneth-Belden faction of the Maniac Latin Disciples, named after the intersection—where defendant was dropped off after the shooting—in the heart of their territory around Hermosa Park. That area is also known as "Omskiville," in honor of a Maniac Latin Disciple, Omar Gonzalez, or "Omski," who was killed by a Spanish Cobra in the 1990s. According to Officer Miehle, gangs sometimes "honor" or pay "tribute" to a fallen member by shooting a member of the rival gang in retaliation—typically on the fallen gang member's birthday, or else on the anniversary of his death. The date of Jeanette's murder, March 18, was Omski's birthday.

¶ 31    Through Officer Miehle, the State also introduced 10 photos of defendant's numerous gang tattoos, which the trial court admitted on the issues of motive and identification. These tattoos spanned the better part of defendant's body, ranging from his lower legs to his face and covering nearly all of his neck and back.

¶ 32    Many were references to Kenneth and Belden—either those words spelled out; or the initials "K" and "B;" or the numerals "11" and "2," stand-ins that correspond to the position of these letters in the alphabet; or the phrase "BK Mafia." There were various instances of the letter "D," a standard reference to "Disciples" in the gang's name; and the word "Horny," a reference to defendant's street name, "Horny D." There is one instance of "Hermosa," a reference to Hermosa Park; and two instances of "Omskiville," one on defendant's lower back and another on one of his hands.

¶ 33    The "2" and the "11" were small blue tattoos near his eyes, as Banuelos had described to Detective Taraszkiewcz.

¶ 34    And there were various images, mostly of the Maniac Latin Disciples' symbols. There were various horned devil-like creatures, hearts with horns, and pitchforks—always facing up, to show respect for the gang, whereas the Spanish Cobra diamond was depicted in various tattoos facing down, to show disrespect to these rivals.

¶ 35    Two of these images included swastikas. On defendant's left arm, a hooded, horned creature holding a pitchfork has a swastika where one would expect to see a face. And on defendant's left leg, there is a "D" with a swastika inside of it.

¶ 36    During his direct examination, Officer Miehle specifically noted these swastikas and, in response to the State's questions, explained what he understands them to represent. The founder of the Maniac Latin Disciples was a "history buff" who "idolized Adolf Hitler" and thus "used the street name of Hitler." Like Hitler, the gang's founder "didn't believe in a group running everything" but rather "believed in one individual strong enough to control the nation" (or the gang). When Officer Miehle continued, "[s]o when he was murdered by the Latin Kings some time in the '70s," the court sustained defense counsel's objection to this "running narrative," and thus ended the discussion of the swastikas and Adolph Hitler.

¶ 37                        V. Theories, arguments, and verdict

¶ 38    As noted at the outset, the State argued that this was a gang tribute killing—an act of retaliation by a Maniac Latin Disciple against the Spanish Cobras, in retaliation for the murder of Omski, carried out, as per tradition, on Omski's birthday. The State countered with a multi-faceted defense that challenged the reliability of the identifications and the credibility of Camacho and asserted an alibi. Defendant never challenged the State's assertion that he was a Maniac Latin Disciple. To the contrary, defense counsel had offered to stipulate to that fact, in a pre-trial hearing, in an effort to keep *all* of defendant's gang tattoos out of evidence. The State

relied heavily on those tattoos, and Officer Miehle's testimony, to support its theory of motive, but it made no further mention of the swastikas or the testimony about Hitler. After the jury found defendant guilty of first-degree murder, the trial court sentenced him to 50 years in prison, including the mandatory firearm enhancement. This appeal follows.

¶ 39                                    ANALYSIS

¶ 40     The substantive question before us is whether the State's use of defendant's swastika tattoos and Officer Miehle's accompanying testimony—the Nazi-themed evidence, as we will sometimes call it—unfairly prejudiced defendant and thus warrants a new trial. But first, a few words on the parties' disagreement over how this issue has been raised on appeal.

¶ 41                                    I. Forfeiture

¶ 42     In his opening brief, defendant acknowledged that the precise points of error argued on appeal—the prejudice resulting specifically from the swastika tattoos and the testimony about "Hitler"—were not properly raised in the proceedings below. Take the swastika tattoos: before trial, counsel objected to the State using *any* of defendant's tattoos, arguing that because they were all gang-related, they were, *in general*, were more prejudicial than probative. Counsel thus offered to stipulate to defendant's gang membership in an effort to exclude them all.

¶ 43     The trial court rejected this argument, finding that defendant's gang tattoos in general were highly probative on the questions of motive and identification. In the wake of that ruling, defense counsel could have more specifically sought to exclude the swastika tattoos in particular, on the ground that *those* tattoos carried a unique risk of prejudice, given the swastika's ordinary and perhaps inevitable connotations. But counsel did not single out those particular tattoos for additional objection.

¶ 44     On appeal, defendant viewed that as a forfeiture and thus raised the issue as ineffective

assistance of counsel, citing the familiar standard in *Strickland v. Washington*, 466 U.S. 668, 697 (1984) to claim that trial counsel was deficient for failing to object to these particular swastikas, and that this deficiency resulted in prejudice to him. In its response brief, the State claimed that counsel's objection to the tattoos in general was sufficient to raise the appellate issue; for this reason (among others), counsel could not be deemed deficient. There was a similar back-and-forth in the briefs about the adequacy of counsel's objections to Officer Miehle's testimony, but we will not belabor those details.

¶ 45    Defendant took the State's response on appeal as a concession that any claim of error was preserved, not forfeited. So he sought leave to file a supplemental brief addressing the issue as preserved evidentiary error by the trial court, rather than ineffective assistance of counsel. We granted defendant leave, over the State's objection. The State responded, in its own supplemental brief, that it would be inappropriate to consider the issue as preserved error, since defendant failed to do so in his opening brief. In other words, by treating a preserved issue as forfeited—a "strategic decision," the State says—he thus worked a fresh "forfeiture" on appeal.

¶ 46    There is much that we *could* say about all of this, but all we *need* say is that none of it matters to the disposition of this case.

¶ 47    If we agreed with defendant that trial counsel's objections were insufficient and thus that the proper appellate issue was ineffective assistance, we would be free, actually encouraged, to resolve the case (if possible) on the issue of prejudice alone, if we found that any deficiency by counsel did not impact the verdict. See *People v. Coleman*, 183 Ill. 2d 366, 397–98 (1998) (court may reject ineffectiveness claim if defendant cannot show prejudice, without reaching question of deficiency, as "lack of prejudice renders irrelevant the issue of counsel's performance.").

¶ 48    If, on the other hand, we agreed with the State that counsel preserved the issue below

with adequate objections to the Nazi-themed evidence, we would be equally free to resolve the case (if possible) on the issue of harmless error alone. See, *e.g.*, *People v. Delhaye*, 2021 IL App (2d) 190271, ¶ 99 (stating, in typical fashion, "Even if the videos were improperly admitted, considering the entirety of the record, any error in their admission was harmless.")

¶ 49    Either way—preserved trial-court error or ineffective assistance—we would apply exactly the same standard. Prejudice, under *Strickland*, 466 U.S. at 694, means "a reasonable probability that, but for counsel's unprofessional errors [in failing to object to the improper evidence], the result of the proceeding would have been different." A non-constitutional evidentiary error is harmless if "there is no reasonable probability that the jury would have acquitted the defendant absent the [introduction of the improper evidence]." *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990)).

¶ 50    So we need not decide whether trial-court error or ineffective assistance provides the appropriate analytical framework—or, for that matter, whether counsel adequately objected to one piece of disputed evidence but not the other. If defendant cannot show prejudice or harmful error, he cannot prevail on appeal. See *Strickland*, 466 U.S. at 694; *E.H.*, 224 Ill. 2d at 180. For the reasons discussed below, we reach that conclusion here.

¶ 51    We begin by assessing the nature and extent of the prejudice caused by the disputed evidence and the use that the State made of it at trial. We then consider there is a reasonable probability that any prejudicial effect of the evidence affected the verdict, given the overall strength of the State's case against him.

¶ 52                                II. The Nazi-themed evidence

¶ 53    Defendant argues that the Nazi-themed evidence would inevitably lead the jury to believe that he harbored Nazi sympathies or beliefs—that he espoused the pernicious ideology of the

regime whose foremost symbol he twice tattooed on his body. Thus, revealing his swastika tattoos to the jury could easily stoke contempt for him without adding anything probative, since Jeanette's murder had nothing to do with antisemitism, white supremacism, or other canonical Nazi or neo-Nazi beliefs. See Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Lynn*, 388 Ill. App. 3d 272, 278 (2009) ("Typically, the prejudicial effect of certain evidence 'means that the evidence in question will somehow cast a negative light upon the defendant for reasons that have nothing to do with case on trial.' " (quoting *People v. Dea*, 353 Ill. App. 3d 898, 903 (2004) (Steigmann, J., specially concurring)).

¶ 54    This much is undeniable: defendant's swastika tattoos would, at first blush, strike the jury as an expression of Nazi or neo-Nazi ideology. That is what the symbolic or expressive act of displaying a swastika, on one's body or anywhere else, generally means. And that remains true even if, as the State assures us, it was not trying to paint defendant as a neo-Nazi, but rather to show his gang membership and loyalty, the extent to which he was steeped in the gang's symbolism, history, and lore, and his respect for its fallen members.

¶ 55    The State's purposes, intentions, or theories of relevance do not limit the meaning that a historically laden symbol like a swastika will inevitably bear in the jurors' minds. Just as words have meanings imparted to them by their place in the language, symbols—at least certain symbols, the swastika surely prominent among them—have meanings imparted to them by their place in history. Symbols, like words, mean what they mean, and their meanings are not entirely up to us when we use them.

¶ 56    Proudly display a swastika, and people will think—without hesitation and usually with no small amount of horror and contempt—that you are aligning yourself with the Nazi regime and what it stood for. Tell a jury that the defendant is tattooed with swastikas, and the jury, at least at

first blush, will draw the same conclusion. That may not be the State's *point* in using this evidence, but the unspoken implications are all but certain to come across, anyway.

¶ 57     Granted, one can try to disavow those implications. But when a symbol is this laden with meaning, disentangling the two is no easy task. The State is confident it succeeded in that task here. Officer Miehle's testimony, the State argues, "refute[d]" any "prejudicial "interpretation of the tattoo[s]" as an expression of Nazi or neo-Nazi beliefs. We mean no criticism of the officer— he was simply explaining what he was asked to explain—but his testimony hardly distanced the swastika tattoos from their usual meaning.

¶ 58     Officer Miehle testified that the swastika is a symbol used by the Maniac Latin Disciples. And he set out to explain the origins of this piece of gang iconography. To this end, he linked the symbol to one "Mr. Rodriguez," the gang's founder and one of its "fallen members," as the State likes to say. Thus, the State's theory, more specifically stated, is that defendant's swastika tattoos were a symbol of respect for Mr. Rodriguez. But that doesn't necessarily show that the swastika tattoos are not still an expression of Nazi ideology. To settle that question, we need to know how and why a swastika honors Mr. Rodriguez.

¶ 59     The jury heard the reason: because Mr. Rodriguez "idolized Adolf Hitler," so much so, in fact, that he adopted the Nazi dictator's surname as his own street name. And Mr. Rodriguez, or "Hitler," as he asked to be called, was an avowed fascist—he "believed in one individual strong enough to control the nation" (or the gang). Officer Miehle thus explicitly tied the gang's founder (if not the gang's found*ing*) to at least one key tenet of Nazi belief, its murderous political ideology. That is as far as the explanation went, as the court sustained counsel's objection to the officer's "narrative" about "Hitler."

¶ 60     True, Officer Miehle said nothing out loud about the canonical Nazi ideologies of white

supremacism and antisemitism. But was the jury really expected to separate Nazism's racist, nationalist, and bigoted views from its fascism? Could one reasonably be expected to "idolize" Hitler's leadership model while rejecting his bigotry? That, in our view, is a bridge too far. Any mention of Nazism or Hitler is inextricably linked to its hateful ideology.

¶ 61    Officer Miehle's testimony hardly put any daylight between defendant's swastika tattoos and their usual Nazi meaning; all the officer interposed between them was: "Hitler." If someone is tattooed with swastikas, knowing full well what they ordinarily symbolize, and knowing full well (as one steeped in the gang's history and lore) that they are worn as an homage to "Hitler," it is ridiculous to suggest (as the State does) that those swastikas do not bear, are not meant to bear, and will not be taken to bear, their usual Nazi meaning.

¶ 62    We are at a loss to explain how the combination of swastika tattoos and the testimony about "Hitler" would lead the jury to think anything but the obvious: that defendant, in some measure, supported Nazi or neo-Nazi beliefs. Experience teaches this lesson clearly, and the point will rarely be lost on people of common sense. So whatever limited purposes the State may think up to justify its use of the swastika tattoos at trial, we don't doubt that the jurors took this evidence at face value. Their common sense and experience (to say nothing of the testimony about "Hitler") give them every reason to do so.

¶ 63    While the swastika tattoos were inherently prejudicial, they did not meaningfully improve the jury's fact-finding. Indeed, several of defendant's other tattoos—all gang-related but without the unique risk of prejudice posed by the swastikas—were more than sufficient to serve the State's valid evidentiary purposes.

¶ 64    The State's general point was that defendant was a Maniac Latin Disciple and deeply committed to the life and lore of his gang. See *People v. Suastegui*, 374 Ill. App. 3d 635, 645

(2007) (where shooting tied to gang rivalry, tattoos admissible to show gang membership, as they "merely depicted the [gang's] symbols and did not contain additional language or illustrations that would be inflammatory or prejudicial to defendant"). The State had eight other photos of defendant's numerous tattoos with which to make this point.

¶ 65    The State's more specific point was that "Omski's" murder and the resulting gang feud supplied defendant's motive for this cold-blooded murder. See *People v. Smith*, 141 Ill. 2d 40, 58 (1990) (evidence of gang membership admissible to show motive for "otherwise inexplicable act"). Two of defendant's tattoos could hardly be more to this point: "Omskiville" was tattooed across his lower back and one of his hands. Several others were variations on the "Omskiville" theme: "K," "B," "11," "2," "BK Mafia," and "Hermosa" all reflected his membership in the Kenneth-Belden faction, whose area was known as "Omskiville," in honor of the fallen member defendant was said to avenge.

¶ 66    The "Omskiville" and related tattoos spoke directly to defendant's alleged motive and thus had heightened relevance; others spoke more generally, but relevantly enough and without undue prejudice, to his gang membership and commitments. With all of those tattoos properly before the jury, what further insight, into any relevant question of fact could be gleaned from the swastika tattoos in particular? None.

¶ 67    Indeed, the relevance of defendant's swastika tattoos was diminished three times over. First, their relevance was limited to the general point that he was a proud Maniac Latin Disciple; unlike the "Omskiville" and related tattoos, they did not speak directly to his alleged motive for the murder. Second, while that general point was relevant, it was not disputed, and "evidence, while still relevant, has diminished probative value when the fact it is offered to prove is not in dispute." *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 116 (citing Michael H. Graham, Cleary

and Graham's Handbook of Illinois Evidence, § 403.1, at 189). Third, plenty of non-swastika gang tattoos spoke to this general question clearly, without the risk of undue prejudice caused by the swastikas themselves or the needless distraction of Officer Miehle's otherwise irrelevant "narrative" about "Hitler." At best, the swastika tattoos were cumulative evidence, and that, too, diminishes their probative value—but not their prejudicial effect. *People v. Maya*, 2017 IL App (3d) 150079, ¶ 70.

¶ 68      All told, the unfair prejudice of the Nazi-themed evidence clearly outweighed any minimal probative value it may have had. Ill. R. Evid. 403; *People v. Villareal*, 198 Ill. 2d 209, 232 (2001); *Maya*, 2017 IL App (3d) 150079, ¶ 70 (cumulative nature of evidence "increase[es] the chances that the danger of undue prejudice will come to outweigh the probative value.").

¶ 69      In fairness to the State, we hasten to add that the State never asked the jury to draw any particular inferences from the swastika tattoos; in fact, the State never even mentioned them during its arguments. They only came into focus momentarily, when the State asked Officer Miehle to explain their provenance. (Perhaps that was a well-intentioned attempt to disentangle the swastikas from their ordinary and obviously prejudicial meaning; but if so, it was not successful—in fact it backfired with the Hitler reference.) Beyond this one brief mention, the State left the swastika tattoos aside, and nothing else presented or argued during the trial compounded the unfair prejudice this evidence created.

¶ 70      In sum, the Nazi-themed evidence posed an obvious risk of unfair prejudice, but that risk was mitigated by its limited role in the trial. That said, the State—and trial courts—would do well to remember that the swastika is a uniquely "potent symbol of intolerance, hatred, and violence." *Dickinson v. Austin*, No. 90–15100, 1991 WL 166411 (9th Cir. Aug. 30, 1991). It is to be used with great caution at a criminal trial, and only when it has clear relevance to the specific

factual questions put to the jury. In a weak enough case, even the very limited use made of this evidence here could warrant reversal. But as we discuss below, this case, overall, was not weak.

¶ 71                                    III. The case against defendant

¶ 72    The State's case comprised three main categories of evidence: eyewitness identifications; evidence of gang membership and motive; and Blanca Camacho's testimony, which overlapped with the other two categories.

¶ 73    We begin with the identification evidence. Defendant says it was "incredibly weak." Of the five eyewitnesses within feet of the shooting, he says, not one of them identified him from the photo array. That is not entirely true; and the part that is true is misleading.

¶ 74    Banuelos and Jimenez, the two Spanish Cobras who were in the van when Jeanette was shot, refused to cooperate with the police—as gang members often do. Banuelos made clear that he did not want to put himself at odds with the Maniac Latin Disciples, his own gang's rivals; as he told Detective Taraszkiewcz, "I don't need those kinds of problems." (But he did say that the shooter had a light blue tattoo under his eye—like defendant.)

¶ 75    Jimenez, the "hard-core Spanish Cobra," toyed with the detectives; he "would hardly even look at" them and seemed to take "a certain amount of satisfaction" in being "intentionally uncooperative." So it is hardly significant that neither of these witnesses identified defendant, as if their refusal to cooperate somehow casts doubt on the two witnesses who did identify defendant. Banuelos and Jimenez simply zero out of the equation.

¶ 76    Hector did not identify defendant the first time he viewed the photo array, but he did identify defendant the second time. And it's not as if Hector had no idea what the shooter looked like until suddenly he did. Hector believed that he could identify the shooter the first time: "#4" in the array, he said. The issue for Hector, as for his fellow Spanish Cobras, was whether he was

willing to cooperate with the police. At first his answer was no, or at least not yet; after he conferred with Jeanette's mother and inquired whether the matter would be "handled by the streets," he decided he would cooperate with law enforcement. And then he identified defendant. Whatever else one might say about Hector, this alone does not call the reliability of his identification into serious doubt.

¶ 77    Bennett did not identify defendant from the photo array, but she did identify him in a live lineup. And her initial failure (so to speak) to identify defendant was due, at least in part, to a laudable sense of caution. One person in the photo array "looked familiar" to Bennett, though she "wasn't sure based on the picture alone." To her credit, Bennett wanted to be careful not "to pick the wrong person;" not unreasonably, she "felt more comfortable" making an identification after viewing the suspect in person rather than in a picture.

¶ 78    Martinez is the one eyewitness who falls on defendant's side of the ledger. She did not identify defendant from the photo array and, more importantly, later identified someone else in the live lineup. But Martinez's conflicting identification comes with a serious caveat: she was not wearing her glasses when she saw the shooter. (Recall that she went to the corner store right after Bennett woke her up from a nap and forgot to put them on.)

¶ 79    And it's a small point, but one worth making, that the video depicts a left-handed shooter, and the undisputed evidence was that defendant is left-handed. That is hardly a unique identifier, but it does narrow the field substantially.

¶ 80    All in all, two eyewitnesses—to say nothing of Camacho—identified defendant, and the one conflicting identification came from a witness who wasn't wearing her glasses. The State's eyewitnesses may have had their flaws—and they didn't see the shooter for very long—but we do not agree that the identification evidence, all things considered, was "impossibly weak."

¶ 81    Next there was the motive evidence. The shooting took place on "Omski's" birthday, and it clearly involved a Maniac Latin Disciple targeting Spanish Cobras. So there is ample reason to think that the shooting was a tribute to "Omski." And the tattoo evidence left little doubt about "Omski's" significance to defendant. To be fair, much like defendant's handedness, his tattoos are hardly a unique identifier. We doubt he is the only Maniac Latin Disciple in the Kenneth-Belden faction who proudly wore tattoos like these. But at the very least, defendant's evident connection to the "Omski" feud made him a highly plausible suspect.

¶ 82    Taking the two categories of evidence together, the following picture emerges: defendant was a left-handed Maniac Latin Disciple, as seen on the security footage, who had a small blue tattoo under his eye, as described by Banuelos; a motive to avenge "Omski's death" tattooed all over his body; and who was identified by two eyewitnesses. And on top of all that, the shooter arrived at and left the scene of the murder in a car that happened to be owned by defendant's then-girlfriend, Blanca Camacho, to whose testimony we now turn.

¶ 83    Camacho solidified both the identification and motive evidence. She testified, in short, that the person who got in and out of her car at the scene of the shooting (as seen on the video) was defendant. She had known defendant for at least 16 years, so there was no serious possibility that she was mistaken about this. And after she drove away, defendant not only said "that's what he get"—thus revealing the shooting to be an act of revenge—but also shouted something about "Umski" [*sic*], although Camacho didn't quite understand what he was talking about.

¶ 84    Camacho's testimony, if believed, surely spelled the end for defendant, and so he has had no choice, both at trial and on appeal, but to attack her credibility. To this end, he points out that Camacho initially lied during her interrogation and only implicated him once the detectives showed her the video of her car arriving at and leaving the scene of the murder.

¶ 85    It is not terribly surprising or significant that Camacho didn't come clean until the police cornered her with the video, leaving her with no plausible way to continue to deny that she knew who the shooter was. Nor does it show that Camacho had a reason to frame defendant. At trial, the defense argued that she did exactly that, to protect defendant's cousin Manuel, the father of Camacho's first three children. But defendant does not pursue that argument on appeal, and there are some good reasons to let it go.

¶ 86    Manuel was deceased by the time of trial, if not earlier, and Camacho was already with defendant when she implicated him during her interrogation. In fact, she gave birth to his child in November 2016; she was interrogated on April 5 of that year, meaning that (whether she knew it or not) she was already pregnant. She knew that defendant was a gang member with a history of violence. Indeed, Camacho testified at some length—we have spared the reader the details, since they are not otherwise relevant to the case—that she was terrified of what defendant might do to her or her children once she *did* implicate him in Jeanette's murder. All of which is to say that if Camacho had some incentive to falsely implicate defendant, we have not been told what it is, and her incentives, if anything, appear to run in the opposite direction.

¶ 87    Defendant argued at trial, and at least implies on appeal, that Camacho implicated him to help herself, perhaps to avoid being charged with Jeanette's murder on a theory of accountability. After all, though she wasn't charged, there was at least an appearance that she was or may have been an accomplice in the murder, rather than the unwitting girlfriend that she portrayed herself to be. Hence the jury instruction that her testimony, due to her potential role in the offense, was "subject to suspicion and should be considered by you with caution." Illinois Pattern Jury Instruction, Criminal 4th, No. 3.17.)

¶ 88    Even if defendant is correct that Camacho cooperated to help herself, it does not necessarily mean that she was lying when she pointed the finger at defendant. For the reasons we just gave, she seemed to have every reason *not* to implicate defendant, if she could avoid it. The implicit suggestion of defendant's argument, as best we understand it, is that Camacho told the detectives what they wanted to hear, as the saying goes, out of self-interest as a suspected accomplice. But that is pure speculation; defendant points to no evidence that Camacho even knew at the time that he was a suspect. (At that point, the detectives had Hector's identification in hand, though not Bennett's.)

¶ 89    Lastly, defendant finds it "important[ ]" that the jury was given the accomplice-witness instruction, IPI 3.17, for Camacho. His unspoken argument seems to be that this instruction would or should have led the jury to find Camacho's testimony unbelievable. And that would substantially diminish the State's case and thus raise the odds that the prejudicial effect of the Nazi-themed evidence affected the verdict. But it is important not to read IPI 3.17 as essentially directing a credibility finding. It simply reminds the jury that a witness who was or may have been involved in the charged crime *might* have heightened, self-interested motives to shift blame onto the defendant or otherwise lie about the facts of the case. But if the jury could not find any reason why Camacho would be inclined to falsely implicate defendant, then it was of course free to credit her testimony in full.

¶ 90    All in all, the State presented a fairly strong case against defendant—strong enough to overcome any taint caused by the improperly admitted Nazi-themed evidence. So whether we view this as an ineffective-assistance claim and find a lack of prejudice, or as a preserved evidentiary claim and find the error to have been harmless, the result is the same: though the Nazi-themed evidence should not have found its way into defendant's trial, we remain confident

that the jury would have convicted him without it.

¶ 91                                          CONCLUSION

¶ 92    The judgment of the circuit court is affirmed.

¶ 93    Affirmed.